Consolidated Rail Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, City of Philadelphia and Commonwealth of Pennsylvania, Department of Transportation, Respondents.

Argued October 9, 1980, before Judges MacPhail, Williams, Jr. and Palladino, sitting as a panel of three.

*Joel E. Mazor,* for petitioner.

*John J. Gallagher,* Assistant Counsel, with him *George D. Wenick,* Assistant Attorney General, *Alfred N. Lowenstein,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Judith N. Dean,* Deputy City Solictor, with her *Barry J. Grossman,* Assistant City Solicitor, *Alan J. Davis,* City Solicitor, and *Herbert Smolen,* Deputy City Solicitor, for respondent, City of Philadelphia.

Opinion by Judge MacPhail, December 23, 1980:

This is an appeal by Consolidated Rail Corporation (Conrail) from an order adopted on October 4,

1979, by the Pennsylvania Public Utility Commission (PUC) directing Conrail to bear the costs incurred for repair of the bridge carrying Byberry Road over and above the grade of Conrail tracks in the City of Philadelphia (City), to reimburse the City for the costs it expended in emergency work, and to maintain the bridge in the future.

This case arose as a result of a PUC order adopted on its own motion on February 24, 1978, to investigate the structural adequacy and load bearing capacity of the Byberry Road Bridge. Conrail, the City, the Pennsylvania Department of Transportation (DOT), and the Trustees of the Reading Railroad (Reading) were designated as parties and were directed to answer interrogatories concerning the bridge and its condition and maintenance responsibility. The City was required to close the bridge to vehicular traffic and Conrail was ordered to repair the deck sufficiently to maintain passenger automobile traffic after which the bridge would be reopened. A formal hearing to apportion the costs and future maintenance responsibility was held on July 18, 1978, before Administrative Law Judge F. Ross CRUMLISH (ALJ).

The background of the instant case is as follows:

Byberry Road was opened by jury in 1720. By an ordinance dated April 4, 1904, the City authorized the New York Short Line Railroad Company (Short Line) to construct a bridge carrying Byberry Road over its tracks at its sole cost and expense and to forever maintain the structure. Subsequently the Short Line was made part of Reading. Reading went into reorganization under the federal Bankruptcy Act[1] and pursuant to provisions of the Regional Rail Reorgani-

---

[1] Act of July 1, 1898, ch. 541, 30 Stat. 544, *as amended*, 11 U.S.C. §1 *et seq.*, (1976), repealed and replaced by "Bankruptcy Reform Act of 1978," Act of November 6, 1978, Pub. L. 95-598, 92 Stat. 2549, *as amended*, 11 U.S.C.A. §101 *et seq.* (West 1979).

zation Act of 1973, *as amended,* (RRRA),[2] was trans-
ferred to Conrail on April 1, 1976. Although Reading
had maintained the bridge, Conrail did not continue
the maintenance. By 1978 the deck had deteriorated
to the extent that it was necessary to close the bridge
for repairs.

In his Initial Decision dated March 30, 1979, the
ALJ concluded, *inter alia,* that neither the City nor
DOT[3] has maintenance responsibility for the Byberry
Road bridge; that the City has the responsibility to
maintain the highway approaches to the crossing; that
Conrail should bear the costs incurred in complying
with the February 24, 1978 order; that Conrail should
reimburse the City for the City's expenses in comply-
ing with that order; and that Conrail has the sole re-
sponsibility to inspect and maintain the bridge. Con-
rail filed exceptions.

The PUC heard oral argument on July 16, 1979.
It adopted the ALJ's Initial Decision and denied Con-
rail's exceptions. Conrail appealed to this Court.

Conrail asserts that the PUC erred as a matter of
law in imposing all the costs of repair and future
maintenance on Conrail, that the PUC abused its dis-
cretion in imposing the costs on Conrail, and that,
based on the entire record, the PUC's order is not just
and reasonable.

At the time this instant case began, our scope of re-
view was limited by Section 1107 of the Public Utility

---

[2] Act of Jan. 2, 1974, Pub. L. 93-236, 87 Stat. 985, *as amended,*
45 U.S.C.A. §701 *et seq.* (West Supp. 1980).

[3] In answering the PUC's interrogatories, DOT disclaimed all
responsibility for any costs associated with the bridge because By-
berry Road is a city street, not a state highway. It should be noted
that the PUC directed DOT to expedite its plans for Woodhaven
Road which will be built in the vicinity of Byberry Road. The plans
include a new bridge over the same tracks and the subsequent abol-
ishment of the Byberry Road bridge. DOT has not yet had the funds
to construct Woodhaven Road.

Law (Law)[4] that reads in pertinent part: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission."[5] Section 411(a) of the Law directs the actions of the PUC in this case. It reads in part as follows:

(a) The compensation for damages which the owner of adjacent property taken, injured, or destroyed may sustain in the construction, relocation, alteration, protection, or abolition of any crossing under the provisions of this act, shall, after due notice and hearing, be ascertained and determined by the commission. Such compensation, as well as the *expense of such construction, relocation, alteration, protection, or abolition of any crossing, shall be borne and paid, as hereinafter provided, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the commission may, after due notice and hearing, determine,* unless such proportions are mutually agreed upon and paid by the interested parties. (Emphasis added.)[6]

I

Conrail's first argument is that the PUC committed an error of law in basing its decision solely on a successor in interest theory. We disagree. In its decision the PUC clearly stated that "any question at-

---

[4] Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §1101 *et seq.,* repealed and re-enacted by the Act of July 1, 1978, P.L. 598, 66 Pa. C. S. §101 *et seq.*

[5] 66 P.S. §1437 was repealed by the Act of April 28, 1978, P.L. 202. A similar provision is now found in Section 704 of the Administrative Agency Law, Act of April 28, 1978, P.L. 202, 2 Pa. C. S. §704.

[6] 66 P.S. §1181(a) was repealed and re-enacted by the Act of July 1, 1978, P.L. 598 and is now found at 66 Pa. C. S. §2704.

tendant to the succession of interest and title [of the bridge] is between Conrail and the Reading railroad.'' In the discussion section of the Order, the PUC indicated that it was not limited to any fixed rule in apportioning costs and that all factors should be taken into consideration. The fact that Conrail is Reading's successor was just one factor considered by the PUC.

Conrail further argues that it is in fact not the successor in interest to Reading insofar as the maintenance of the bridge is concerned. Conrail contends that it is not responsible for the maintenance because (1) when Conrail was created by the RRRA, the responsibility for *maintenance* of bridges carrying public highways was not transferred, (2) properties were conveyed "free and clear of all liens and encumberances,'' under Federal law[7] and (3) the ordinance did not state it was binding on any assignees of Short Line.[8] We find these contentions are without merit.

Congress passed the RRRA in order to continue essential rail service in the midwest and northeast regions of the country. Many of the railroads in these areas were insolvent. It was Congress' clear intention that this rail service be continued and improved.[9] The RRRA transferred the assets included in Inter-

---

[7] 45 U.S.C. §743(b)(2) (1976).

[8] In *Consolidated Rail Corporation v. Interstate Commerce Commission*, 590 F.2d 937 (D.C. Cir. 1978), Conrail argued that it should not be bound by a previous order of the Interstate Commerce Commission (ICC) concerning the division of joint rates charged traffic which moves on the lines of two or more railroads. The ICC had adopted the order prior to but it was effective after the creation of Conrail. In rejecting this contention, the Circuit Court stated that Congress did not intend that Conrail would be treated any differently than other railroads. The Circuit Court further said that, "There is nothing in the creation or evolution of Conrail suggesting that it is to be immune from regulation which is not financially favorable to it." *Id.* at 941.

[9] 45 U.S.C. §701 and [1973] U.S. Code Cong. & Ad. News 3242.

582

state Commerce Commission (ICC) accounts Nos. 1-45[10] to Conrail. Included in ICC account No. 39 are above grade bridges. Just because property is transferred free of any liens and encumberances does not mean that the new owner is not responsible for the continued maintenance of that property. If Conrail's assertion were carried to its logical conclusion, Conrail would not have to maintain any of its property. This clearly would not comport with the specific intent of Congress.

The PUC's assessment of bridge repair costs between the old and new owners of a railroad was reviewed by this Court in *Pennsylvania Public Utility Commission v. Southeastern Pennsylvania Transportation Authority*, 21 Pa. Commonwealth Ct. 106, 343 A.2d 371 (1975), (SEPTA). In affirming the assessment of the new owner, we stated that 'it is the presence and ownership of the track involved, not any benefit conferred which places liability on the railroad.' (Citations omitted.) *Id.* at 111, 343 A.2d at 374. *SEPTA* clearly applies to the case at bar. While Conrail may contest ownership of and maintenance responsibilities for the bridge, it can hardly contest ownership of the railroad tracks.

## II

Conrail asserts that the PUC failed to consider all the relevant evidence and abused its discretion in imposing costs of maintenance of the bridge solely upon Conrail. We disagree.

Conrail claims that the age of the structure, the daily rail and vehicular traffic and the causes of the bridge's present condition should have been considered. While it is true that the PUC may consider many factors in apportioning costs, the only require-

---

[10] 49 C.F.R. §1201 (1979).

ment that must be met is that the order be just and reasonable. *Pennsylvania Public Utility Commission v. Department of Transportation,* 2 Pa. Commonwealth Ct. 144, 276 A.2d 573 (1971). A review of the entire record shows that the PUC did receive testimony concerning the age and condition of the structure and the volume of traffic. That the PUC must have considered the condition of the bridge is evident by its Order limiting bridge traffic to vehicles to three tons or less.

Although the costs of the initial repairs and continued maintenance are on Conrail, the burden of the maintenance has been appreciably lessened by the weight restriction. The burden on the City has correspondingly been increased because it must maintain a detour for those vehicles greater than three tons as well as continue to maintain the approaches to the bridge.

### III

Conrail claims that based on the entire record the PUC's order is unjust and unreasonable and that the case should be remanded. We again disagree. An examination of the record shows that the PUC gave opportunity for all interested parties to testify and submit evidence. The record reveals that the bridge was built at the request of the railroad so that its trains could travel unimpeded through this section of the City. By operation of the RRRA, Conrail has become the owner and user of the tracks.

We do not feel that Conrail has carried its heavy burden to show that the PUC order was so unjust or unreasonable that it amounted to an error of law. We find that there is substantial evidence on the record to support the order of the PUC.

Accordingly, we affirm the PUC order adopted October 4, 1979.

584

ORDER

AND NOW, this 23rd day of December, 1980, the order of the Pennsylvania Public Utility Commission adopted October 4, 1979, directing the Consolidated Rail Corporation to pay the costs incurred by it and by the City of Philadelphia in repairing the Byberry Bridge and to regularly inspect and maintain the bridge is hereby affirmed.

President Judge CRUMLISH did not participate in the decision of this case.