NATIONAL RAILROAD PASSENGER
CORPORATION

v.

COMMONWEALTH OF PENNSYLVA-
NIA PUBLIC UTILITY
COMMISSION, et al.

Civ. A. No. 86–5357.

United States District Court,
E.D. Pennsylvania.

June 30, 1987.

David J. Carol and Peter S. Craig, Wash-
ington, D.C., and Harold K. Cohn, Asst.
Gen. Counsel, Philadelphia, Pa., for Nat.
R.R.

William H. Lamb and John D. Snyder,
West Chester, Pa., for Tredyffrin Tp.

Richard S. Herskovitz, Asst. Gen. Coun-
sel, Harrisburg, Pa., for Pa. Public Utility
Com'n.

MEMORANDUM

NEWCOMER, District Judge.

The National Railroad Passenger Corpo-
ration ("Amtrak") brought this action for
declaratory and injunctive relief against an
Order of Pennsylvania Public Utility Com-
mission ("Commission" or "PUC"). The
Order, issued May 30, 1986, assessed

against Amtrak certain costs involved in the replacement of the Cassatt Avenue bridge, which transverses an Amtrak right-of-way. Amtrak has moved for summary judgment, asserting that the assessment of costs by the Commission violates a federal statute which exempts Amtrak from the payment of taxes and certain other fees. *See* 45 U.S.C. § 546b. The defendants, the Commission and Tredyffrin Township ("Township"), have cross-moved for summary judgment on two grounds: (1) the principle of res judicata bars Amtrak from seeking relief in this action from the Order of the Commission; and (2) that the levy against Amtrak is not a "tax or other fee" under 45 U.S.C. § 546b. For the reasons set forth in this Memorandum, Amtrak's motion will be granted, and defendants' motions will be denied.

## I. Facts [1]

The Commonwealth of Pennsylvania, in the exercise of its police power, has entrusted the Public Utility Commission with "broad powers in respect of the crossing of facilities of utilities and particularly of the crossing of highways and railroads." *Tarentum Borough v. Pennsylvania PUC*, 171 Pa.Super. 156, 160–61, 90 A.2d 853 (1952); *see Pennsylvania Rr. Co. v. Pennsylvania PUC*, 136 Pa.Super. 1, 7 A.2d 86 (1939). The Public Utility Code, 66 Pa.C.S.A., contains the statutory authority for the Commission and the general structure of regulation of utilities and common carriers. Section 2702(c) of the Code [2] vests the PUC with exclusive authority to determine and order the manner in which railroad and highway crossings are constructed, altered, relocated or abolished, and which parties should perform the required work, bear the expenses and maintain the crossings. The PUC may appropriate real property to accomplish its orders, 66 Pa.C.S.A. § 2702(d), and determine proper compensation therefor. 66 Pa.C.S.A. § 2704(a). Such compensation, as well as the cost of construction, alteration, relocation or abolition of any crossing, are to be borne by the utility or utilities involved, the municipality or the Commonwealth of Pennsylvania, "in such proper proportion as the commission may, after due notice and hearing, determine." *Id.* In apportioning costs of railroad crossings, the PUC is not bound by any rigid rule, but must take all relevant factors into consideration. [3] *Commonwealth, Department of Transportation v. Pennsylvania PUC*, 79 Pa.Cmwlth. 266, 469 A.2d 1149 (1983); *Department of Transportation v. Pennsylvania PUC*, 21 Pa.Cmwlth. 407, 346 A.2d 371, 375 (1975). The only substantive criterion by which the apportionment of costs is made and reviewed is that the order must be just and reasonable. *Consolidated Rail Corp. v. Pennsylvania P.U.C.*, 55 Pa.Cmwlth. 576, 423 A.2d 1108 (1980). *Pennsylvania P.U.C. v. Department of Transporation*, 2 Pa.Cmwlth. 144, 276 A.2d 573 (1971). A party dissatisfied with the allocation of costs made by the PUC can seek judicial review by appealing the decision to Commonwealth Court. 66 Pa.C.S.A. § 2704(b); 42 Pa.C.S.A. § 763(a)(1).

---

**1.** All of the facts enumerated in this section are undisputed. As such, if these facts are sufficient to demonstrate the entitlement of one party or another to judgment as a matter of law, then judgment will be entered. *See* Fed.R.Civ.P. 56(c); *see also Equimark Commerce Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987); *Bank of America Nat. Trust and Sav. Ass'n. v. Hotel Rittenhouse Associates*, 595 F.Supp. 800 (E.D.Pa.1984).

**2.** 66 Pa.C.S.A. § 2702(c) requires that in any such proceeding, notice must be given to all interested parties and a hearing must be held.

**3.** Some of the factors that have been held to be proper considerations by the Commission in allocating costs are (1) the relative benefits accruing to the parties (*Commonwealth of Penn-*

*sylvania, Department of Transportation v. Pennsylvania PUC*, 79 Pa.Cmwlth. 266, 469 A.2d 1149 (1983)); (2) the existence of federal funds (*Department of Highways v. Pennsylvania PUC*, 185 Pa.Superior Ct. 418, 138 A.2d 143 (1958); (3) deferred maintenance and origin and destination of bridge users (*Department of Transportation v. Pennsylvania PUC*, 21 Pa.Cmwlth. 407, 346 A.2d 371 (1975)); (4) prior ownership and maintenance responsibilities (*Erie Lackawanna Railway Co. v. Pennsylvania PUC*, 2 Pa.Commonwealth Ct. 396, 278 A.2d 188 (1971)); and (5) successor in interest and ownership of tracks (*Consolidated Rail Corproation v. Pennsylvania PUC*, 55 Pa.Cmwlth. 576, 423 A.2d 1108 (1980)).

On April 18, 1981, the PUC began an investigation of a bridge carrying Cassatt Avenue over a railroad right-of-way in Tredyffrin Township. A hearing was held before Administrative Law Judge Martin R. Fountain on January 14, 1986. On April 1, 1986, ALJ Fountain issued a Recommended Decision, including findings of fact and a proposed order. The Recommended Decision approved replacement of the Cassatt Avenue bridge with two new structures, one for vehicular traffic and the other for use as a pedestrian walkway.

ALJ Fountain found that Amtrak owns and operates the rail line under the bridge.[4] Recommended Decision at 5. The Cassatt Avenue bridge was built in 1899–1900 by the Philadelphia Division of the Pennsylvania Railroad Co. It was maintained by Pennsylvania Railroad in the past. Amtrak, the present owner of the tracks, has not maintained the bridge on its own. Recommended Decision at 6.

ALJ Fountain estimated that the cost of the recommended plan was $626,390, including $556,000 for construction and $70,390 for design costs. Recommended Decision at 7, Finding of Fact 4. Of that total, 80 percent would be paid by the Township, which amount would be recovered from the Commonwealth's fund established by the Billion Dollar Bridge Bill. Recommended Decision at 2, Finding of Fact 5. ALJ Fountain recommended that the remaining 20% of the cost be borne by Amtrak. Recommended Decision at 7. No portion of the costs was assigned to either SEPTA or Conrail. Under the recommended Order, Amtrak would be required to maintain the substructure, of the proposed vehicular bridge, and the substructure, superstructure and stairway of the pedestrian walkway. Recommend Decision at 8. In addition, Amtrak was required to bear the "cost" of any damages resulting from diminution of its right of way by the construction project. *Id.*

Following the issuance of the Recommended Decision, Amtrak filed an Exception with the Commission. In its brief, Amtrak argued that the Commission lacked the authority to order Amtrak to pay construction costs. Amtrak's argument was premised upon 45 U.S.C. § 546b, the same statute upon which the instant suit is grounded.[5] On May 30, 1986, with certain changes not relevant here, the PUC adopted the Recommended Decision, and ordered that its terms be given effect. The PUC did not address Amtrak's legal argument, rejecting it *sub silentio*. Amtrak did not appeal to the Commonwealth Court, instead filing the instant action to challenge the legality of the Commission's order.

## II. *Amtrak's Tax Exemption*

Amtrak was established in 1971 as a "for-profit" corporation. 45 U.S.C. § 541. Although Congress envisioned that Amtrak eventually would become independent of federal financial support, it soon became apparent that such would not be the case. By 1980, Congress began studying ways to reduce federal outlays to Amtrak. It passed legislation requiring Amtrak to recover at least one-half of its operating costs from revenues, 45 U.S.C. 564(c)(4)(A), to eliminate any deficit resulting from the on-board sale of food and beverages, 45 U.S.C. § 546(n), and to restructure its routes, 45 U.S.C. § 545(f). *See generally* H.Rpt. 97–81, 97th Cong., 1st Sess. (1981); S.Rpt. 253, 97th Cong., 1st Sess. (1981).

On September 10, 1982, Congress enacted Public Law 97–257, granting Amtrak an exemption from all state and local taxes after October 1, 1981. The statute provides:

---

**4.** 104 passenger trains and 28 Conrail freight trains operate at that location at speeds up to 70 miles per hour. Of the 104 passenger trains, 71 are SEPTA commuter trains and 33 are Amtrak trains. Conrail and SEPTA pay Amtrak for the right to operate their trains over the Amtrak tracks. Recommended Decision at 5–6.

**5.** The argument contained in Amtrak's exceptions to the Recommended Decision of ALJ Fountain took a slightly different form from Amtrak's current argument. There, Amtrak argued that the PUC lacked jurisdiction to assess the costs against Amtrak because the federal statute preempted the field. As argued here, I believe more properly, the question is cast in terms of authority and not jurisdiction.

Notwithstanding any other provision of law, the National Railroad Passenger Corporation (the "Corporation") shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State, or a local taxation authority which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981 including such taxes and fees levied after September 30, 1982.... Notwithstanding the provision of section 1341 of Title 28, the United States district courts shall have original jurisdiction over any civil actions brought by the Corporation to enforce the exemption conferred hereunder and may grant equitable or declaratory relief as requested by the Corporation.

96 Stat. 852 (1982), codified at 45 U.S.C. § 546b.[6] The rationale for the exemption was set forth in the Senate Appropriations Committee Report:

It is generally recognized that State and local taxes on a primarily Federal investment are inappropriate. Moreover, such taxation serves to erode the revenue-to-cost ratios which impact on whether states and localities continue to receive the benefit of Amtrak service. The Committee believes it is unreasonable for Federal funds to be granted to Amtrak to provide a tax windfall to States and localities, and consequently the bill prohibits Amtrak from using any appropriated funds or assets for the payment of any State and local taxes.

S.Rept. No. 353, 97th Cong., 1st Sess. 103 (1981). This language is part of the legislative history of the 1982 Transportation Appropriations Act (Pub.L. 97–102, 95 Stat. 1442), which included a provision deferring by one year the payment of all state and local taxes by Amtrak. Public Law 97–257,

codified at 45 U.S.C. § 546b, converted the one year deferral into a permanent exemption. Upon passing the permanent exemption, the Senate Appropriations Committee noted:

This action was taken in recognition of the fact that there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service. It remains the Committee's judgment that those who receive this service have some obligation to contribute toward its continuation. At a time when local jurisdictions are demanding that nationwide rail passenger service be maintained, it seems reasonable to provide for a "user contribution" whereby those areas receiving the service in turn contribute to Amtrak's continued existence through tax relief.

S.Rep. No. 516, 97th Cong., 2d Sess. 170 (1982).[7]

In 1980, over $14 million of Amtrak's appropriation was used to pay state and local taxes. S.Rep. No. 253, 97th Cong., 1st Sess. 103 (1981). It is clear that Congress sought to ensure that its appropriation to Amtrak would be used to fund Amtrak's operations, and not to pass that appropriation through to the states as an indirect source of revenue sharing.

### III. *Discussion*

In support of its motion for summary judgment, Amtrak argues that it has been exempted from such assessments and other taxes by federal statute. Defendants oppose Amtrak's motion and cross-move for summary judgment on the ground that the assessment of costs by the PUC is not a "tax or other fee" from which the federal

---

6. *National Railroad Passenger Corp. v. New Castle County,* 633 F.Supp. 354 (D.Del.1986), upheld the constitutionality of the Act. The question of constitutionality has not been raised in this action.

7. The House Committee on Energy and Commerce, in reference to a previous bill to provide an exemption from state and local taxes for Amtrak:

[T]he Committee bill exempts Amtrak from the payment of "all state and local taxes, including but not limited to, property taxes, income and franchise taxes, gross revenue taxes, fuel taxes, license and other fees, to the same extent as the United States is exempt from the payment of such taxes and other fees.

L.Rep. No. 97–81, 97th Cong., 1st Sess. 21 (1981). The bill to which this report refers was not adopted in the particular form indicated.

statute exempts Amtrak. Defendants, however, raise res judicata preliminarily as a bar to relief in the instant suit. I turn first to that issue.

## A. Res Judicata

Res Judicata, and the related doctrine of collateral estoppel, have as their basis the protection of final judgments, 1B Moore's *Federal Practice* ¶ 0.405[3] (2d ed. 1987), making valid final judgments binding on the parties and barring subsequent relitigation of the issues. *Id.* at ¶ 0.405[2]. The goal of both doctrines is "to secure the peace and repose of society by the settlement of matters capable of judicial determination." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). As the Pennsylvania Supreme Court wrote in *State Hospital for the Criminal Insane v. Consolidated Water Supply Co.*, 267 Pa. 29, 37, 110 A. 281 (1920):

> The purpose underlying res judicata is more than to serve the interests of one who may see fit to invoke the rule; it is a measure of public policy, based on the principle that the general welfare requires litigation not to be interminable. The courts, for the economy of time belonging to all litigants, will not consider a point which has already been adjudicated between the same litigants.

The prior decision upon which defendants base their res judicata defense is the PUC Order of May 30, 1986. Defendants argue that "Amtrak has had its day in court on the matters presented in the instant federal action. To allow this proceeding to continue would encourage repetitious litigation which res judicata and collateral estoppel are intended to prevent." PUC Brief in Support of its Motion for Summary Judgment at 6.

■ Under Pennsylvania law,[8]

When a court of competent jurisdiction has determined a litigated cause on its merits, the judgment entered and not reversed on appeal is, as between the parties to the suit and their privies, final and conclusive with regard to every fact which might properly be considered in reaching a judicial determination and with regard to all points of law adjudged[,] as those facts and points of law relate directly to the cause of action in litigation.

*Stevenson v. Silverman*, 417 Pa. 187, 191, 208 A.2d 786 (1965) (emphasis omitted), *quoting Goldstein v. Ahrens*, 379 Pa. 330, 334, 108 A.2d 693 (1954). *See also Wallace's Estate*, 316 Pa. 148, 153, 174 A. 397 (1934); *Brandschain v. Lieberman*, 320 Pa.Super. 10, 466 A.2d 1035, 1037 (1983); *Jenkins v. Jenkins*, 246 Pa.Super. 455, 371 A.2d 925, 929 (1977). "The essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties had an opportunity to appear and assert their rights." *Callery v. Blythe Township Mu-*

---

8. Amtrak argues that, because the underlying issue is one of federal law, federal principles of res judicata apply. Plaintiff's Opposition to Defendants' Motions for Summary Judgment at 11 n. 3. Amtrak relies primarily on *Maher v. City of New Orleans*, 516 F.2d 1051, 1056 (5th Cir. 1975) (Adams, J., sitting by designation), *cert. denied*, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). It is my considered opinion that *Maher* is incorrect. In considering whether to give preclusive effect to a state court judgment, a federal court is required to give the state judgment the same preclusive effect it would have in the state which issued the judgment. *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); Act of May 26, 1790, ch. 11, 1 Stat. 122, codified at 28 U.S.C. § 1738 ("The ... judicial proceedings of any court of any state ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State."). *See also* U.S. Const. art. IV, § 1.

To accomplish the directive of this policy, it is necessary to apply the res judicata principles of the state which issued the judgment which is claimed to have preclusive effect.

> It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the state from which the judgment is taken. *McElmoyle v. Cohen*, 38 U.S. (13 Pet.) 312, 326 [10 L.Ed. 177] (1839); *Mills v. Duryee*, 11 U.S. (7 Cranch) 481, 485, [3 L.Ed. 411] (1813).

*Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982).

*nicipal Authority,* 432 Pa. 307, 312, 243 A.2d 385 (1968) (citation omitted).[9]

In certain instances, these principles of res judicata also apply to decisions of administrative agencies, "when the reasons for the uses of the rule in court proceedings are present in full force." [10] *City of McKeesport v. Pennsylvania PUC,* 65 Pa. Cmwlth. 179, 442 A.2d 30, 31 (1982), *citing Philadelphia Electric Co. v. Pennsylvania PUC,* 61 Pa.Cmwlth. 325, 433 A.2d 620 (1981). · *See also* K. Davis, 4 *Administrative Law Treatise* § 21.1 (2d ed. 1981); 1 *P.L.E.* Administrative Law and Procedure § 93. Clearly, when an administrative agency, adjudicating a dispute within its jurisdiction, in accordance with the requirements of due process—including giving the parties an opportunity to be heard—makes findings of fact which are not overturned on appeal, those findings are ordinarily entitled to preclusive effect. *United States v. Utah Construction and Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), *cited in Philadelphia Electric Co. v. Borough of Lansdale,* 283 Pa.Super. 378, 424 A.2d 514, 521 (1981). But whether an administrative agency's decision on a question of law is to be given res judicata effect is a more complex question.

In *Philadelphia Electric Co. v. Borough of Lansdale, supra,* the Pennsylvania Superior Court faced the question whether to apply res judicata to a determination of the Federal Power Commission. In that case, plaintiff sued defendant in equity seeking reformation of a contract for the sale of electricity under Pennsylvania law. Plain-

tiff had unsuccessfully sought the same relief previously before the Federal Power Commission, which gave a full hearing and decided the issue on the merits according to Pennsylvania law. The Court of Common Pleas of Montgomery County reformed the contract and cross-appeals were taken. The Superior Court reversed, holding that the unappealed decision of the Federal Power Commission was res judicata.[11]

In so ruling, the Superior Court noted that the Federal Power Commission has recognized jurisdiction and authority to determine issues concerning the intent of parties to electric rate agreements, *id.* at 522, *citing City of Cleveland v. Federal Power Commission,* 525 F.2d 845 (D.C.Cir.1976); *Sam Rayburn Dam Electric Coop. v. Federal Power Commission,* 515 F.2d 998 (D.C.Cir.1975), and that "[i]n rendering its decisions, the Federal power Commission wrote detailed, reasoned opinions." *Borough of Lansdale, supra,* 424 A.2d at 522. The Superior Court continued:

[I]t is clear that the Federal Power Commission, in determining rates, has the authority to inquire into the intent of the parties.... It has the expertise to decide rate cases, conducts its proceedings in a "judicial manner" affording each party the right to be heard, renders reasoned opinions in reaching its decisions, and has demonstrated the ability and willingness to apply recognized principles of state contract law to disputes involving the intent of the parties' [sic] to an agreement coming within its jurisdiction. In addition, the federal courts have rec-

---

**9.** Stated another way, for the doctrine of res judicata to apply, there must be the so-called "four identities." *Callery, supra,* 432 Pa. at 312, 243 A.2d 385. The four identities are: (1) identity of issues; (2) identity of causes of action; (3) identity of parties to the action; and (4) identity of the capacity. of the party suing or sued. *Safegurad Mut. Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664 (1975); *Philadelphia Electric Co. v. Borough of Lansdale,* 283 Pa.Super. 378, 424 A.2d 514, 519 (1981). Because this traditional means of characterizing the requirements of res judicata does little to aid the legal analysis and is fully covered by the more readily understood analysis quoted in the body of this Memorandum, I will not use it. Of course,

if I were to employ this form of the test my conclusions would remain the same.

**10.** Prior to *Philadelphia Electric, supra,* the Pennsylvania cases did not formally recognize the applicability of res judicata to decisions of administrative agencies, although they did recognize the need for finality in agency orders as well as those of courts. *See, e.g., West Penn Power Co. v. Pennsylvania PUC,* 174 Pa.Super. 123, 128–32, 100 A.2d 110 (1953).

**11.** In so doing, the Superior Court applied Pennsylvania res judicata principles. 424 A.2d at 519, 522 (employing the Pennsylvania "four identities" formulation).

ognized its competence in deciding matters previously discussed.

*Id.* The Court therefore held that res judicata should apply to the agency determination. *Id.* at 522–23.

■ Applying the same standards to the case before me, I conclude that the decision of the PUC is not entitled to res judicata effect on the issue of Amtrak's statutory tax exemption. While it is beyond dispute that the PUC has the expertise and jurisdiction to perform its statutory duty to apportion costs of railroad crossings, *City of Philadelphia v. Pennsylvania PUC,* 91 Pa.Cmwlth. 123, 496 A.2d 924, 926 (1985), its competence to determine other legal issues beyond the scope of its normal appropriation decision presents significant differences. Unlike the situation in *Borough of Lansdale, supra,* the legal determination required to decide if Amtrak may properly be assessed these construction and maintenance fees is not at all similar to the PUC's usual scope of decision-making. In apportioning costs, the only standard which the PUC must meet is that its decision be just and reasonable. *City of Philadelphia v. Pennsylvania PUC, supra,* 496 A.2d at 926. But to decide whether such a "just and reasonable" assessment is a tax from which Congress has exempted Amtrak is a determination of a different kind and order. Nothing in the PUC's normal fulfillment of its statutory mandate confers upon it the expertise to interpret such a federal statute.

It is true that the PUC, through its proceedings before the Administrative Law Judge, acted in a judicial manner and afforded each party the opportunity to be heard. The PUC did not, however, render a reasoned opinion delineating its basis for rejecting Amtrak's claim of exemption from the assessment. Rather, the PUC never addressed Amtrak's legal claim at all, simply affirming the ALJ's decision to impose the assessment against Amtrak,[12] and declining to address the legal question posed. The failure to address the substantive legal question confirms that the question posed lies beyond the normal scope of PUC process.[13] In addition, the PUC has not demonstrated the ability or the willingness to apply the relevant legal principles to Amtrak's legal challenge to the assessment against it. Under these circumstances, applying the standards discussed in *Borough of Lansdale* for the application of res judicata to administrative decision, I conclude that the PUC's determination that Amtrak is not exempt from the assessment imposed would not be binding on a state court, and is not binding on a federal court.

### B. Is Amtrak Exempt from the PUC Assessment?

■ Amtrak argues that it is exempt from the PUC assessment for construction and maintenance of the right-of-way crossings by the clear import of the exemption contained in section 546b. Defendants agree that Amtrak has been exempted from state and local taxes. Defendants argue here, however, that the exemption does not apply to the PUC order in this case. Before addressing defendant's arguments I will set the context of the discussion.

■ Since the Supreme Court decided *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) (Marshall, Ch.J.), it has been settled law that the federal government, its agencies and instrumentalities are immune from all forms of taxa-

---

**12.** I do not mean to imply that the PUC could obtain res judicata or collateral estoppel effect for its decisions in this area simply by rendering reasoned opinions. That question is not before me. It seems doubtful, however, that the PUC could confer competence, expertise or jurisdiction upon itself simply by explaining the basis for its decisions in realms outside its normal scope of decision-making.

**13.** *But cf., Pennsylvania v. Brown,* 373 F.2d 771, 777 (3d Cir.1967) (an issue clearly presented to a court is taken to be covered by the court's decision even if the issue is not addressed in the court's opinion). *Brown* properly presumes conclusively that state court decisions are binding on federal courts even if state interpretation issued *sub silentio.* That case did not, nor did those cases upon which it relied, address the circumstances in which any court, state or federal, would be bound by prior state agency rulings under the doctrines of res judicata or collateral estoppel.

tion. *United States v. County of Alleghe-ny*, 322 U.S. 174, 177, 64 S.Ct. 908, 911, 88 L.Ed. 1209 (1944). This immunity extends not only to general taxation, but also to special assessments for local improvements. *Wisconsin Central Rr. Co. v. Price County*, 133 U.S. 496, 504, 10 S.Ct. 341, 344, 33 L.Ed. 687 (1890); *Mullen Benevolent Corp. v. United States*, 290 U.S. 89, 54 S.Ct. 38, 78 L.Ed. 192 (1933); *United States v. Harford County*, 572 F.Supp. 239, 241 (D.Md.1983); 49 Comp.Gen. 72 (1969). *See also United States General Accounting Office, Office of General Counsel, Principles of Federal Appropriations Law*, 3–187 to 3–194 (1982). On the other hand, the United States recognizes its obligation to pay state and local government charges for a quantum of goods or services provided, *Harford County, supra*, 572 F.Supp. at 241 (water and sewer services), as well as the costs associated with connection to local service systems. 39 Comp.Gen. 120 (1949) (connection to local sewer system).

█ While generally immune from local taxes and assessments the United States has the power to waive its immunity, in whole or in part. To effect, such a waiver, "Congress must express a clear, express, and affirmative desire to waive the exemption." *Federal Reserve Bank of St. Louis v. Metrocentre Improvement District, #1*, 657 F.2d 183, 186 (8th Cir.1981); *See County of Allegheny, supra*, 322 U.S. at 177, 64 S.Ct. at 911; *United States v. City of Adair*, 539 F.2d 1185, 1189 (8th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977). Congressional waivers of federal tax immunity are to be strictly construed, *Oklahoma v. Barnsdall Corp.*, 296 U.S. 521, 526, 56 S.Ct. 340, 342, 80 L.Ed. 366 (1936); *City of Adair, supra*, 539 F.2d at 1189, in keeping with a liberal view of the United States, immunity from all state and local taxes as a sovereign. Thus, it has been held that a statute which waives the immunity of a federal instrumentality from real estate taxes does not waive immunity from special assessments. *Metrocentre, supra; City of Adair, supra*.

As waivers of the tax immunity of the federal government or its instrumentalities are to be strictly construed, so too legislative exemptions of private entities from taxation by state and local entities are ordinarily strictly construed. *Illinois Central Rr. Co. v. City of Decatur*, 147 U.S. 190, 13 S.Ct. 293, 37 L.Ed. 132 (1893). In that case, petitioner had been exempted by Illinois statute from the payment of taxes on land obtained under a federal grant. The City of Decatur, sought to impose on petitioner a special assessment to defray the costs of grading and paving a road. The trial court entered judgment in favor of Decatur, and the Supreme Court of Illinois affirmed. The United States Supreme Court also affirmed, explaining the rationale for its decision in the most general of terms. The Court distinguished general taxation from special assessments:

> Special assessments are a peculiar species of taxation, standing apart from the general burdens imposed for state and municipal purposes and governed by principles that do not apply generally. The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed beyond what may be anticipated from an administration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it. The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of a public work, are at the same time to suffer no pecuniary loss thereby, their property being increased in value by the expenditure to an amount at least equal to the sums they are required to pay.

This is the idea that underlies all these levies. As in the case of all other taxation, it may sometimes happen that the expenditure will fail to realize the expectation on which the levy is made; and it may thus appear that a special assessment has been laid when justice would have required the levy of a general tax; but the liability of a principle to erroneous or defective application cannot demonstrate the unsoundness of the principle itself, and that which supports special assessments is believed to be firmly based in reason and justice.

147 U.S. at 198–99, 13 S.Ct. at 294 (quoting *Cooley on Taxation* 416). The Court went on to state that a general legislative tax exemption could not be inferred to include an exemption from special assessments because special assessments are local in nature and do not produce revenue for the state treasury, whereas general taxation produces revenue for the state treasury. Because the two types of taxation produce essentially different funds, in the *Decatur* Court's view an exemption from contributions to the state treasury does not in any way affect the susceptibility of a property owner to local contributions through special assessments. *Id.* at 204, 13 S.Ct. at 296.

■ In light of these principles, I now turn to consider the scope of the exemption which Congress granted to Amtrak. Section 546b exempts Amtrak from the payment of "any taxes or other fees imposed by any state, political subdivision of a state, or local taxation authority." In construing the statute, I begin with the plain meaning of its words, which is most likely to convey Congress' understanding of the law it enacted. According to *Webster's Third International Dictionary* (1971), a tax [14] is defined as "a usually pecuniary charge imposed by legislature or other public authority upon persons or property for public purposes; a forced contribution of wealth to meet the public needs of a government." This general definition of the term tax contains no basis for distinguishing between a general tax and a special assessment, nor would any reasonable common understanding of the term in the context of this statute.

The common sense understanding of taxation to include any involuntary exaction to support a governmental entity or purpose is consistent with the intent of Congress expressed in the statute and the legislative record quoted *supra*. Congress sought to conserve the money it appropriated to Amtrak, and to restrict its use to Amtrak operations. It explicitly sought to prevent the diversion of the funds appropriated, to those states and localities for benefit of which Amtrak receives subsidies. To that end, it is clear that the effect on Amtrak of a general tax or a special assessment is the same: the use of funds, intended for Amtrak operations, for the precise purpose Congress sought to prohibit.

There is no indication in the legislative history that Congress intended any understanding other than the plain meaning of the statute's words. Congress simply did not intend to adopt the hypertechnical construction which the *Decatur* court applied to the Illinois exemption before it. The distinction between state funds created by general taxes and local funds created by special taxes is of no moment here. Section 546b explicitly exempts Amtrak from payment of state and local taxes alike.

In fact, the construction advocated by the defendants here would be used quite readily, by these defendants and others, to undermine the goal of Congress in enacting the exemption. General taxation, for example on real estate holdings, at least pur-

---

**14.** "Where a federal right is involved, a federal court is not bound by the characterization given to or state tax by a state court nor relieved from the duty of considering the real nature of the tax and its effect on the federal right assessed." *Harford County, supra*, 572 F.Supp. at 242, *citing Carpenter v. Shaw*, 280 U.S. 363, 367–68, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930); *Allegheny, supra*, 322 U.S. at 184, 64 S.Ct. at 914.

Defendant's argument that the assessment is not a tax because it was made pursuant to police power and not taxing power is both incorrect and of no moment. The legislature has essentially authorized the PUC to assess those before it for the funds required to perform its governmental function.

ports to be proportional to the value of the property held. Special assessments, on the other hand, can very easily be discriminatorily applied. In the instant case, 80 percent of the cost of construction was assessed against Tredyffrin Township. That is precisely the amount which the Commonwealth would reimburse Tredyffrin Township under the Billion Dollar Bridge Bill. *See supra* at 4. The only party in this litigation which would be required to bear non-reimbursible expenses is Amtrak. Such discriminatory assessments run precisely counter to the situation Congress sought to foster, even more than non-discriminatory general taxes. They are simply incompatible with Congressional intent as expressed in the exemption and its legislative history.

The understanding of section 546b which I have adopted is further supported by the nature of the relationship between Amtrak and the United States. Amtrak was established by Congress as a United States corporation for profit. 45 U.S.C. § 541. The many goals of Congress in establishing and maintaining Amtrak were set forth in §§ 501 and 501a. While I will not repeat the findings and goals contained in those sections, it is evident that they manifest a federal commitment to maintain and improve rail passenger service, federal controls over Amtrak management and operations and federal financial support for Amtrak. *See also* Comptroller General, *Report to the Congress of the United States: Alternatives for Eliminating Amtrak's Debt to the Government* 6–12 (March 28, 1980) ("Comptroller General's Report").

The federal government has retained substantial controls over Amtrak's operations. The composition of the board of directors is heavily influenced by the federal government. 45 U.S.C. § 543. The Congress exerts systematic influence on Amtrak's route structure, 45 U.S.C. § 564; Comptroller General's Report at 7–8, and on other aspects of operations. *See e.g.,* 45 U.S.C. § 545(n) (food and beverage service). Amtrak must make regular detailed re-

ports to the United States concerning its operations. 45 U.S.C. § 548. Amtrak is also subject to other federal supervision including GAO audits of financial transactions and performance, and controls over Amtrak banking and checking accounts. Comptroller General's Report at 7. Amtrak cannot issue large financial obligations without approval of the Secretary of the Treasury. *Id.* In addition, a very substantial portion of Amtrak's operating budget comes from federal appropriation. *Id.* at 9–11.

The Amtrak enabling legislation provides that Amtrak "will not be an agency or establishment of the United States government." 45 U.S.C. § 541. However, federal immunity from state and local taxation extends to instrumentalities of the United States as well as to its agencies. *City of Adair, supra,* 539 F.2d at 1188; *see McCulloch, supra,* 17 U.S. (4 Wheat.) at 425–35. "[A] government instrumentality is one that performs an important governmental function." *Metrocentre Improvement District, supra,* 657 F.2d at 185 and n. 2.

Whether Amtrak is formally an instrumentality of the United States for the purpose of federal tax immunity,[15] however, is not crucial to this case, because Congress has explicitly enacted Amtrak's tax immunity in section 546b. *Cf. id.* at 186. The extensive federal involvement is Amtrak's management, finances and operations make it apparent that the legislative exemptions should be liberally construed to effectuate its goals. Section 546b is no mere exemption of an essentially private entity in exchange for some other benefit to the federal government. Rather, it is an attempt to guarantee Amtrak's fiscal integrity, and indeed its survival. The federal government has pursued governmental functions and policies through Amtrak. It would be inappropriate to undermine those goals through the too stingy construction of the exemption offered by defendants.

---

**15.** I believe that it is. *But see, Sentner v. Amtrak,* 540 F.Supp. 557 (D.N.J.1982), (Amtrak is not an instrumentality of the United States for the purpose of assessing punitive damages).

**412**

IV. *Conclusion*

For all of these reasons, I conclude that section 546b exempts Amtrak from the payment of special assessments such as that imposed by the PUC. Judgment will therefore be entered for the plaintiff.

An appropriate order follows.

## ORDER

. AND NOW, this 30th day of June, 1987, it is hereby Ordered that plaintiff's motion for summary judgment is GRANTED, and defendants' cross-motions for summary judgment is DENIED. Judgement is entered in favor of the National Railroad Passenger Corporation and against the Commonwealth of Pennsylvania Public Utility Commission and the Township of Tredyffrin.

It is further Ordered and Decreed that any assignment of costs to the National Railroad Passenger Corporation under the Pennsylvania Public Utility Commission's Order for design, construction or maintenance of the Cassatt Avenue bridge structures violates 45 U.S.C. § 546b, as a tax levied on the National Railroad Passenger Corporation.

It is further Ordered that the Public Utility Commission and Tredyffrin Township are PERMANENTLY ENJOINED from assessing such a tax regarding the Cassatt Avenue bridge on the National Railroad Passenger Corporation, or enforcing the Pennsylvania Public Utility Commission Order of May 30, 1986 against the National Railroad Passenger Corporation.

AND IT IS SO ORDERED.