**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and Township of Lower Merion.**

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and Township of Upper Gwynedd.**

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION.**

Civ. Nos. 92–0112, 92–1029 and 92–3793.

United States District Court, E.D. Pennsylvania.

Sept. 29, 1992.

**1276**

David P. Bruton, Alfred W. Putnam, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff Southeastern Pennsylvania Transport. Authority.

Susan D. Colwell, David A. Salapa, Harrisburg, Pa., for defendant Pennsylvania Public Utility Com'n.

Gilbert P. High Jr., Thomas D. Rees, Lori K. Comer, High, Swartz, Roberts & Seidel, Norristown, Pa., for defendant Tp. of Lower Merion.

Robert J. Kerns, Lansdale, Pa., for defendant Tp. of Upper Gwynedd.

## OPINION

LOUIS H. POLLAK, District Judge.

These consolidated cases involve three separate orders issued by defendant Pennsylvania Public Utility Commission ("the PUC") allocating costs upon plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") for maintenance of four highway bridge structures that pass over railway lines owned and operated by SEPTA.[1] SEPTA claims that this assignment of costs is precluded by a pair of federally conferred tax immunities: 45 U.S.C. § 581(c)(5) (1988) and 45 U.S.C. § 546b (1988).[2] Defendants—the PUC and two Pennsylvania townships forced to share bridge maintenance costs with SEPTA—argue that this court lacks jurisdiction

to hear this action because, under the Tax Injunction Act, 28 U.S.C. § 1341 (1988) [hereinafter § 1341], "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."[3]

Section 1341 withholds from federal courts power to decide questions that otherwise would fall within the jurisdiction of the federal courts; however, Congress can create a statutory exception to § 1341, and has indeed done so in 45 U.S.C. § 546b for Amtrak. The main question presented in these cases is whether Congress intended § 581(c)(5) to bestow upon SEPTA, a commuter and urban transit enterprise, a tax immunity of the sort conferred on Amtrak by § 546b, enforceable in the federal courts notwithstanding § 1341.

## I

### Factual and Procedural Background

■ The PUC is invested with power to allocate costs of construction and maintenance of rail-highway crossings among interested parties. *See* 66 P.C.A. § 2704(a) (1979); *see generally Pennsylvania Dept. of Transp. v. Pennsylvania Pub. Util. Comm'n*, 76 Pa.Cmwlth. 525, 464 A.2d 645 (1983). Factors considered by the PUC in making such assessments include prior ownership and maintenance responsibilities, benefits that will flow to the parties from the crossing, availability of funds, ownership of the tracks, and the general equities of the case. *National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 665 F.Supp. 402, 403 n. 3 (E.D.Pa.1987), *aff'd National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 848 F.2d 436, 440 (3d Cir.1988)

---

**1.** None of these consolidated cases involves any of the 133 *railway* bridges that carry SEPTA owned and operated railway lines over public highways, or any of the highway bridges that overhang railway lines operated by SEPTA but owned by other railroad companies.

**2.** *See infra* pp. 1278–1279 for the text of these provisions.

**3.** Additionally, defendant Township of Lower Merion argues that SEPTA has failed to state a claim of tax immunity, *see infra* Part III, and the PUC argues that the Eleventh Amendment precludes this court from entertaining the action against it. *See infra* Part V.

(*Amtrak I*), *cert. denied*, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988).

In 1982, the PUC began a series of investigations to determine the safety of all bridges in Pennsylvania that carry public highways over railroad tracks. At that time, bridge maintenance was mostly being funded by cities and local townships and, in some instances, by the trustees of the Penn Central Transportation Company.[4] Many of the inspected bridges were found to be in poor condition, and in 1987, the PUC began to reevaluate the maintenance responsibilities for a number of these bridges. In many cases, SEPTA—when it owned and operated the underlying rail lines—was assigned interim and then final maintenance responsibilities for the bridges.

At issue in these consolidated cases are maintenance costs imposed on SEPTA with respect to four highway bridges: the Montgomery Avenue bridge in defendant Township of Lower Merion, Swedesford Road bridge located in defendant Upper Gwynedd, and Johnson Street bridge and Willow Grove Avenue bridge in the City of Philadelphia. SEPTA owns and operates the railway lines passing beneath each of these bridges,[5] and, with the exception of the Montgomery Avenue bridge, the PUC determined that each of the bridge structures was also owned by SEPTA.[6] The highways, on the other hand, are owned by the defendant townships and the City of Philadelphia. Determining that benefits from a separated crossing accrued both to SEPTA,

as the railway line operator, and to the localities, as the road owners, the PUC—in three separate proceedings—imposed shared maintenance responsibility for each of the bridges.[7]

Before final maintenance responsibilities were assigned, Administrative Law Judge Marlene Chestnut, in each instance, conducted evidentiary hearings, made recommended decisions, and presented those decisions to the PUC. The PUC then entertained exceptions from interested parties and issued three final rulings. During the course of these proceedings, the Third Circuit, applying Amtrak's federally-created tax exemption (§ 546b), enjoined the PUC from imposing upon Amtrak the costs of reconstructing a highway bridge, *see Amtrak I, supra*, and Congress enacted § 581(c)(5), extending to commuter authorities like SEPTA exemption from "taxes or other fees to the same extent as" Amtrak. In each of the three separate proceedings, SEPTA argued before the PUC that § 581(c)(5) precluded the allocation of bridge maintenance costs to SEPTA. Relying on *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 140 Pa. Cmwlth. 270, 592 A.2d 797 (1991), *appeal denied by* —— Pa. ——, 611 A.2d 714 (1991), and *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 140 Pa.Cmwlth. 292, 592 A.2d 808 (1991), *appeal denied by* —— Pa. ——, 611 A.2d 714 (1991), the PUC determined that § 581(c)(5) was inapposite.[8]

Subsequently, SEPTA filed three separate complaints with this court challenging

---

**4.** The Pennsylvania Railroad, which merged with the New York Central Railroad and became the Penn Central Transportation Company in 1968, entered bankruptcy in 1970.

**5.** Ownership of each of the lines in question (the Ivy Ridge Line, Route R5, and the Chestnut Hill West Line) was transferred to SEPTA from Consolidated Rail Corporation (popularly known as "Conrail") between 1976 and 1979.

**6.** The Commission found that ownership of the bridges was transferred by Conrail along with the railroad rights-of-way.

**7.** For the Swedesford Road, Johnson Street, and Willow Grove Avenue bridges, the locality was held responsible for maintaining the bridge road surface and the top of the bridge itself, and

SEPTA was required to maintain the rest of the substructure and superstructure of the bridge. For the Montgomery Avenue bridge, SEPTA was allocated the up-keep cost for the bridge below the exterior surface of the bridge's arch, the adjacent sidewalks, and the facilities at the crossing itself, and Lower Merion Township was ordered to perform an annual inspection of the bridge.

**8.** In these opinions, the Pennsylvania Commonwealth Court held that § 581(c)(5) does not entitle SEPTA—as a mere state organization—to the same broad state tax immunity that Amtrak deserved as a quasi-federal entity. Additionally, the court concluded, disagreeing with the Third Circuit, that assessments for maintenance are not "taxes or other fees" within the meaning of the federal exemption.

**1278**

the legality of the PUC's orders and requesting declaratory and injunctive relief. On August 19, 1992, I consolidated these cases.

## II

### History of the Tax Exemption Statutes

The Consolidated Rail Corporation ("Conrail") was established by the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.* (1988), to purchase and operate the properties of insolvent railroads and form an efficient national rail transport system. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 627, 104 S.Ct. 1248, 1250–51, 79 L.Ed.2d 568 (1984). Conrail, almost from its inception, operated commuter rail lines at a consistent loss—despite massive federal investment. As a result, the Northeast Commuter Rail Service Act of 1981, 45 U.S.C. § 581 *et seq.*, required Conrail to cease provision of local commuter rail service at the end of 1982 and transfer such operations to local commuter authorities. Concerned that local authorities could not handle such services on their own, Congress, in the same Act, created the Amtrak Commuter Services Corporation ("Amtrak Commuter"), as a wholly owned subsidiary of the National Railroad Passenger Corporation ("Amtrak"). Amtrak Commuter was made available to local authorities, on a contract basis, to provide commuter rail service formerly handled by Conrail. Under this reorganization, local commuter authorities had the option to contract out operation of rail commuter services to Amtrak Commuter or operate their own rail commuter services. SEPTA elected the latter course and, on January 1, 1983, assumed from Conrail the operation of thirteen commuter rail lines.

Like Conrail, Amtrak—established as a "for profit corporation" by Congress in 1971 to provide intercity rail passenger service, 45 U.S.C. § 541—experienced serious financial woes through the 1970s, despite significant federal support. In 1981, Congress passed legislation designed to cut back Amtrak's federal subsidy. *See, e.g.,* 45 U.S.C. 564(c)(4)(A) (requiring Amtrak to

recover at least one-half of its operating costs from revenue). Then, on September 10, 1982, Congress enacted 45 U.S.C. § 546b, exempting Amtrak and Amtrak Commuter "from any taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981. . . ." The statute continues:

> Notwithstanding the provision of section 1341 of Title 28, the United States district courts shall have original jurisdiction over any civil actions brought by the Corporation to enforce the exemption conferred hereunder and may grant equitable or declaratory relief as requested by the Corporation.

45 U.S.C. 546b (1988).

The genesis of the tax exemption mandated by § 546b is clear. The Secretary of Transportation determined that it would be inappropriate for states and localities to tax a primarily federal investment, particularly where that entity was struggling financially.

> Had Amtrak been profitable as well as initially expected, it would have met its tax obligations with private funds, just as other private corporations do. Instead, it now meets its obligations with public funds. The irony of paying taxes with taxes has the effect of diverting Amtrak's attention and funds from the purpose Congress intended.

Department of Transportation (DOT) Report (September 1980), *quoted in* H.Rep. No. 81, 97th Cong., 1st Sess. 20 (1981). Congress apparently agreed with this reasoning, and in light of the benefits received by the states and localities from Amtrak's service, decided to allocate to them some of the attendant costs.

> [A permanent tax exemption] was given in recognition of the fact that there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service. It remains the Committee's judgment that

those who receive this service have some obligation to contribute toward its continuation. At a time when local jurisdictions are demanding that nationwide rail passenger service be maintained, it seems reasonable to provide for a "user contribution" whereby those areas receiving the service in turn contribute to Amtrak's continued existence through tax relief.

S.Rep. No. 516, 97th Cong., 2d Sess. 170 (1982).

In 1988, Congress enacted 45 U.S.C. § 581(c)(5), providing that:

Notwithstanding any other provision of law, any commuter authority that could have contracted with Amtrak Commuter for the provision of commuter service but which elected to operate directly its own commuter service as of January 1, 1983, shall be exempt from the payment of any taxes or other fees to the same extent as [Amtrak] is exempt.

SEPTA is expressly defined as a "commuter authority." *See* 45 U.S.C. § 502(8). Section 581(c)(5) apparently has no significant legislative history.

### III

### "Taxes or Other Fees"

 As an initial matter, defendant Township of Lower Merion argues that SEPTA has failed both to state a claim under Fed.R.Civ.P. 12(b)(6) and to establish federal question jurisdiction under 28 U.S.C. § 1331, because no "taxes or other fees" have been imposed on SEPTA within the meaning of § 581(c)(5).[9] Challenges to jurisdiction based on the legal insufficiency of a claim are subject to the standards of a 12(b)(6) motion, and dismissal is warranted only if defendant shows that no claim has been stated. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir. 1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). The position that no "taxes or other fees, within the meaning of § 546b, are involved in this case is flatly contradicted by *Amtrak I, supra,* whose underlying facts are virtually indistinguishable from the situation at bar.[10]

In that case, the PUC had ordered Amtrak to pay 20% of the costs involved in the replacement of a highway bridge structure that traversed Amtrak-owned railway tracks. The district court, entertaining Amtrak's challenge to the PUC order, granted summary judgment in Amtrak's favor and permanently enjoined the PUC from assessing the costs in question. *See National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 665 F.Supp. 402, 410 (E.D. Pa.1987). In doing so, the district court found no merit in what it termed a "hypertechnical" distinction between a general tax (imposed in return for the overall benefits of government) and a special assessment (made in consideration of a distinctive benefit received).[11] The

**9.** By contrast, the PUC and the Township of Upper Gwynedd appear to allow, for purposes of their motions to dismiss for lack of subject matter jurisdiction, that the assignment of maintenance obligations is a "tax" within the meaning of § 581(c)(5).

**10.** The Pennsylvania Commonwealth Court recently declined to follow the Third Circuit's holding in *Amtrak I* that the allocation of bridge maintenance costs is a "tax or other fee" within the meaning of § 546b. *See supra* note 8. Nonetheless, it is well understood that "[w]here a federal right is concerned we are not bound by the characterization given to a state tax by state courts or Legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." *United States v. Allegheny County,* 322 U.S. 174, 184, 64 S.Ct. 908, 914, 88 L.Ed.

1209 (1943); *see also Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 375 (3d Cir.1978) (declining to infer a congressional intent to leave a jurisdictional provision dependent on state law "absent an unambiguous and express incorporation by statute"). A state court arguably has some leeway to disregard decisions on federal questions handed down by the federal court of appeals for the circuit embracing that state, *see Southeastern Pa. Transp. Auth.,* 592 A.2d at 803 n. 9, but a federal district court has no such luxury.

**11.** In other contexts, an entity generally exempt from taxes had, nevertheless, been required to pay special assessments that increased the value of the affected property and flowed into the local rather than the state treasury. *See Illinois Central R.R. v. City of Decatur,* 147 U.S. 190, 13 S.Ct. 293, 37 L.Ed. 132 (1893).

district court noted that the fee in question—regardless of why it was imposed and whom it benefited—was incompatible with the clear congressional purpose that funds appropriated to Amtrak not be diverted to the state and local governments. As further support for its broad understanding of § 546b, the court emphasized that the statute was designed to guarantee the survival of a federally-created entity. "The federal government has pursued governmental functions and policies through Amtrak. It would be inappropriate to undermine those goals through the too stingy construction of the exemption offered by defendants." 665 F.Supp. at 411. Accordingly, the court concluded that § 546b extended to special assessments to finance the replacement of the bridge.

The Third Circuit agreed with the district court that this tax exemption should be liberally construed because of Amtrak's "federal ties." *Amtrak I*, 848 F.2d at 440. Acknowledging that tax exemptions to private entities are typically strictly construed, the court reasoned that Amtrak deserved virtually the same privileged tax status as the federal government which, in the absence of an express exception by Congress, is typically immune from direct state taxation.

[T]he unique structure and mission of the Corporation are sufficient to remove it from the realm of purely private entities. Consequently, we need not assume that the customary presumption of obligation to pay state and local taxes applied to the Corporation. To the contrary, the signals point the other way. The House Committee on Energy and Commerce said that Amtrak was to be exempt from payment of "all state and local taxes, *including but not limited to* property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, *to the same extent as the United States is exempt* from the payment of such taxes or other fees."

848 F.2d at 440 (citation omitted) (emphases in original). The court continued:

[Congress's] intention is clear—to impose a passenger rail "user fee" on state and local governments. It would be manifestly inconsistent with that design to make Amtrak pay for related local improvements in the many instances where the states could, and would, impose them.

*Id.* Therefore, the Third Circuit concluded that Amtrak's immunity from local "taxes or other fees" in section 546b extends to involuntary assessments to improve a bridge.[12]

**12.** The involuntary assessments involved in *Amtrak I* and the instant case are clearly distinguishable from *National R.R. Passenger Corp. v. City of New York*, 882 F.2d 710 (2d Cir.1989), on which the Pennsylvania Commonwealth Court relied. In that case, the Pennsylvania, New York and Long Island Railroad Company had entered agreements with New York City in 1902 and 1907, wherein it earned the right to operate its railroad on city property in return for an annual rental payment to the City for the use of streets, waterways, and public lands. Amtrak succeeded in interest to the Pennsylvania, New York and Long Island Railroad Company, and, after § 546b was enacted, ceased paying rental fees to the City. The Second Circuit held that the provision did not relieve Amtrak of its obligation to pay rent for the rights of way it had obtained from the City. The court pointed to specific language in the DOT Report that " 'it is not the Committee's desire to exempt Amtrak from the payment of fees for services used, such as water and sewer, just as the United States is not exempt from the payment of such fees.' "

882 F.2d at 714 (quoting DOT Report, in H.Rep. No. 81, 97th Cong., 1st Sess. 21 (1981)). Additionally, on the court's view, the consensual agreement between Amtrak's predecessors and the City proved that the rental payments were not taxes, which are unilaterally imposed. The court concluded:

[B]ecause this case involves consensual payments made in exchange for the use of real property by Amtrak, we have no occasion to consider whether the Third Circuit's reasoning in *National Railroad Passenger Corp.*, 848 F.2d 436, would lead to a different result. In that case, the court concluded that a nonconsensual assessment on Amtrak intended to partially fund construction of a bridge was an assessment for a local improvement from which Amtrak was exempt. In contrast, the circumstances presented to us so clearly concern an area not within the parameters of section 546b that it is unnecessary to consider the federal tax immunity rules considered by the Third Circuit.

882 F.2d at 716 n.2.

■ Defendant Township of Lower Merion attempts to distinguish *Amtrak I* by arguing that SEPTA, unlike Amtrak, is a state instrumentality subject to regulation by the PUC; therefore, on the Township's view, SEPTA is not entitled to the same broad immunity from state taxes that the Third Circuit preserved for the quasi-federal Amtrak. While it is of course possible to construct reasons why SEPTA should not receive the same tax exemption as Amtrak, Congress, in section 581(c)(5), conferred tax immunity on SEPTA "to the same extent" as Amtrak. When the terms of a statute are unambiguous, "judicial inquiry is complete...." *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Therefore, just as the imposition of an assessment on Amtrak to finance the reconstruction of a

bridge running over its tracks is a "tax or other fee" under § 546b, so the allocation of maintenance responsibilities for the four bridges in question is—"to the same extent"—a "tax or other fee" within the meaning of § 581(c)(5).[13] Accordingly, plaintiff has stated a claim under Rule 12(b)(6) and raised a federal question under 28 U.S.C. § 1331.

## IV

### § 1341's Jurisdictional Bar

■ The mere presence of a federal question will not suffice to establish jurisdiction where the jurisdictional bar raised by § 1341 operates. Accepting, as likely, defendants' contention that § 1341 extends to the instant efforts to enjoin the PUC's allocation of bridge maintenance costs,[14]

---

**13.** Where a jurisdictional determination requires resolution of genuinely disputed facts intertwined with the merits of the case, that decision typically should await a determination of the relevant facts by the court on summary judgment or by the fact-finder at trial. *Boyle v. Governor's VOAC*, 925 F.2d 71, 74 (3d Cir.1991); *Wade v. Rogala*, 270 F.2d 280, 285 (3d Cir.1959); *see generally* Charles A. Wright and Arthur C. Miller, *Federal Practice and Procedure* § 1350, at 235 (1990). However, here, *Amtrak I*—which is so directly on point—dictates the conclusion that the costs in question are "taxes" under § 581(c)(5), as a matter of law.

There are two potential—but ultimately unimportant—factual distinctions between the costs allocated to SEPTA and the costs levied on Amtrak. First, in this case SEPTA was charged with the responsibility of maintaining an existing bridge, whereas Amtrak was ordered to fund the construction of a new bridge. In *National R.R. Passenger Corp. v. Pennsylvania*, Civ. A. No. 86–8357, 1991 WL 998 (E.D.Pa. Jan. 2, 1991) (*Amtrak II*), the PUC—having decided to repair rather than replace the bridge at issue in *Amtrak I*—argued that as the successor in interest to the Pennsylvania Railroad, which had built the bridge, Amtrak was required to contribute to its maintenance, while allowing that Amtrak could not be ordered to finance its replacement. Judge Newcomer decided that the repair versus replace distinction "was a distinction without a difference." 1991 WL 998 at * 2. Forced payments for local improvements constitute a "tax or other fee" within the meaning of §§ 546b and 581(c)(5), regardless of the precise form that these improvements might take.

A second possible factual difference is that, with regard to three of the four bridges involved in the instant consolidated cases, the PUC made a formal finding that SEPTA owned the struc-

ture. The PUC concluded that the conveyance of the rights-of-way included, with it, ownership of the overhanging structures. While this pronouncement of ownership may deserve res judicata effect on that particular issue, *see National R.R. Passenger Corp.*, 665 F.Supp. at 407, it is another "distinction without a difference" for purposes of § 581(c)(5). In *Amtrak I*, the district court determined, and the Third Circuit affirmed, that the allocation of bridge replacement costs was a "tax or other fee" without considering the question of ownership of the bridge or future ownership of the reconstructed bridge. The absence of discussion of bridge ownership suggests that this fact was not relevant to a characterization of the fee in question. (Indeed, the PUC itself, even in one of these consolidated cases, has allocated bridge maintenance costs to SEPTA where SEPTA was not the owner of the bridge; instead of stressing ownership of the bridge, the PUC, as in *Amtrak II*, has argued that the responsibility to maintain the bridge runs with ownership of the tracks beneath it.) Moreover, SEPTA—which evidently perceived no net benefit in bridge ownership—opposed any determination that it owned the various bridges. It would be inappropriate to hinge the scope of a federal tax immunity on a formal state declaration lacking any relevant effect on the underlying equities. *See supra* note 10.

**14.** § 1341 precludes the district courts from restraining the collection of any "tax under State law" in certain circumstances, and the meaning of the term "tax under State law" is "determined as a matter of federal law by reference to congressional policies underlying the Tax Injunction Act, rather than by adoption of state tax labels developed in entirely different legal con-

the challenge is to reconcile § 1341, which bars jurisdiction, with §§ 581(c)(5) and 546b, which would appear to confer it.

Defendant do not dispute, nor could they, that Congress can create a statutory exception to § 1341. *See, e.g., Burlington N.R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (holding that district court could review railroad's claim of discriminatory state taxation under the federal Railroad Revitalization and Regulatory Reform Act, where that Act expressly declared exception from § 1341). Here, § 546b explicitly allows Amtrak and its subsidiaries to enforce their tax exemption in federal court "[n]otwithstanding the provision of section 1341 of Title 28," and § 581(c)(5) exempts SEPTA from taxation "to the same extent" as Amtrak. Even though it is impossible to make sense of § 581(c)(5) without reference to § 546b— because the former is designed to replicate the latter—defendants would separate the two provisions, at least for jurisdictional purposes. On defendants' view, because 581(c)(5) does not remove § 1341's jurisdictional bar in the same direct terms as does the Amtrak exception, this court has no jurisdiction to entertain this case on the merits.

 It is true that where Congress has withheld federal court jurisdiction over a general class of cases, as in § 1341, the district courts should not exercise jurisdiction over a case falling within that provision, absent clear congressional authorization. *See, e.g., Blangerers v. Burlington N., Inc.,* 872 F.2d 327, 328 (9th Cir.1989) (per curiam). Nonetheless, in searching for clear indications of congressional in-

tent, it is possible to construe statutes too narrowly. To demand that Congress write out the magic words "notwithstanding the limitations on district court jurisdiction embodied in 28 U.S.C. § 1341" whenever it desires to create a federally-enforceable tax immunity—thereby precluding the shorthand method of incorporation as well as the obvious, but implicit, repeal—would be to expect an unrealistic linguistic precision in the legislative process. *Cf. Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 56 n. 7, 109 S.Ct. 2273, 2294 n. 7, 105 L.Ed.2d 1 (1989) (White, J., concurring) (refusing to require any "magic words" in a statute to achieve abrogation of the Eleventh Amendment).[15] Perhaps for this reason, courts have never required Congress literally to declare, using any particular words, that § 1341 does not apply when the statutory scheme otherwise makes clear Congress's desire to confer a federally-enforced tax immunity. Indeed, courts have based exceptions to § 1341 on statutes that did not so much as mention the Tax Injunction Act. *See, e.g., Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (upholding a federal district court injunction against Montana's collection of certain sales taxes from Indian merchants based on 28 U.S.C. § 1362,[16] which gives the district courts original jurisdiction over certain civil actions brought by Indian tribes but nowhere mentions § 1341); *City Vending of Muskogee v. Oklahoma Tax Comm'n,* 898 F.2d 122, 123 (10th Cir.1990) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990) (§ 1341 "will not preclude the determination of state tax liability where federal courts have jurisdiction un-

---

texts." *Robinson,* 581 F.2d at 374. Therefore, the determination by the Pennsylvania Commonwealth Court that bridge maintenance cost allocation is not a "tax" under § 581(c)(5) is not relevant to a federal court's determination of whether that fee is a "tax under State law" within the meaning of § 1341.

15. *See* discussion *infra* note 24. If Congress need not use "magic words" to abrogate the Eleventh Amendment—even though that amendment (unlike § 1341) implicates the fundamental *constitutional* balance between the federal government and the states, *Atascadero*

*State Hosp. v. Scanlon,* 473 U.S. 234, 242–43, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)—it follows that Congress should have at least that degree of latitude when it carves exceptions to its own general policies.

16. 28 U.S.C. § 1362 (1976) provides:
 The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

der the Bankruptcy Code, 11 U.S.C. § 505," [17] even though the Code makes no reference to § 1341); *Firestone Tire & Rubber Co. v. Bodle*, 645 F.Supp. 305, 310 (N.D. Ohio 1986) (concluding that Congress created an exception to § 1341 in 29 U.S.C. § 1132,[18] which permits a civil action in federal court for enforcement of rights under ERISA, but which nowhere mentions § 1341). Therefore, the mere absence of explicit reference to § 1341 in § 581(c)(5) does not itself preclude this court from exercising jurisdiction in this case.

■■■■ Claiming that jurisdictional statutes are narrowly construed, defendants would read § 581(c)(5)'s "to the same extent as" language as conferring on SEPTA the "same" substantive tax immunity as Amtrak but not the same federal court access to enforce that immunity.[19] However, the general canon of statutory construction that federal courts "scrupulously confine their own jurisdiction to the precise limits which the statute has defined," *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934), in no way relieves this court of the obligation to make a

---

17. Under § 505(a)(1)
 > the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

18. This section of ERISA provides in relevant part that "the district courts ... shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary." 29 U.S.C. § 1132(e)(1) (1988).

19. As support for this distinction between immunity and jurisdiction, defendants rely on *Navajo Tribal Util. Auth. v. Arizona Dept. of Revenue*, 608 F.2d 1228 (9th Cir.1979). In that case, the Navajo Tribal Utility Authority (NTUA)—a subordinate economic enterprise of the Navajo Indian Tribe—appealed from the district court's dismissal of its action seeking to enjoin the Arizona Department of Revenue from imposing various taxes. In attempting to avoid § 1341, the NTUA relied on 28 U.S.C. § 1362, which, in *Moe, supra*, the Court had interpreted as authorizing an Indian tribe to sue in federal court to enjoin imposition of certain taxes on Indian merchants, notwithstanding § 1341. The Ninth Circuit found that § 1362 was not directly available to the NTUA, since it was not an "Indian tribe or band" within the meaning of the Act. Alternatively, the NTUA attempted to bring itself under the umbrella of § 1362 indirectly. Noting that the Supreme Court had recognized that a tribe has standing to protest taxes on a tribal enterprise in state court, *see Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the NTUA argued that a tax imposed on a tribal enterprise should, for jurisdictional purposes, be treated as a tax against the tribe itself. To this argument, the court responded, "such a view speaks only to the question of tax immunity, not to the question of federal jurisdiction ... 'United States District Courts are courts of limited jurisdiction and jurisdictional statutes are closely con-

strued.'" 608 F.2d at 1233 (citation omitted). On the discrete jurisdictional question, the court noted that "[t]here is not the slightest suggestion in the plain language of section 1362 itself or its limited legislative history that Congress designed the statute to provide access to federal courts for subordinate, semi-autonomous entities of Indian tribes and bands." 608 F.2d at 1232.

*Navajo Tribal Utility* does not help defendants. This case stands for the unexceptionable proposition that a judicially-conferred right to enforce a tax immunity in state court does not itself translate into a right to enforce that immunity in federal court, especially where there is no indication that Congress intended to provide such federal access. The opinion does not deny that when Congress evinces a desire to accord plaintiff the same tax treatment as an entity allowed to enforce its immunity in federal court, this intention should be respected.

Indeed, this case resembles *Moe* much more than *Navajo*. In *Moe*, the Supreme Court upheld a district court injunction against Montana's collection of certain sales taxes from Indian merchants. In doing so, the court relied on 28 U.S.C. § 1362, which conferred on the district courts original jurisdiction over all civil actions brought by Indian tribes that raise federal questions. After investigating § 1362's legislative history, the Court concluded that Congress had intended to open federal courts to the kinds of claims that could have been, but were not, brought by the United States as trustee. Finding that the United States would not have been barred by § 1341 from attacking the state tax in federal court, and that Congress wanted to accord to the tribes similar treatment to that of the United States had it sued on their behalf, the Court concluded that the tribe could also sue in federal court despite § 1341. Just as the tribe inherited the United States' right to sue in federal court because of a congressional desire to treat the two entities equivalently for tax purposes, so SEPTA has stepped into Amtrak's shoes, for whom § 1341 is no barrier, because of an identical tax immunity.

sensible interpretation of the statute consistent with the legislative purpose in enacting it.[20]

It makes no sense to conclude that Congress designed § 581(c)(5) to be enforced exclusively in the state courts. That provision does not merely confer federal tax immunity upon commuter authorities; it confers upon any commuter authority that could have contracted with Amtrak for local rail service the same favored tax position as Amtrak so that such an entity is not penalized by its decision to operate commuter rail service directly. It would be manifestly inconsistent with that design to limit SEPTA's legal remedies to state courts, which might, as has proven true here, more narrowly construe the federal tax immunity.

 Moreover, reading § 581(c)(5) as an exception to the Tax Injunction Act does not frustrate the underlying purposes of that Act. § 1341 is designed to preserve from judicial interference "the imperative need of a State to administer its own fiscal operations," *Tully v. Griffin*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976), but here *Congress itself* has denied fiscal autonomy insofar as the state seeks to impose certain taxes on commuter authorities. The existence of a federally-created tax immunity distinguishes the case at bar from situations where the courts have refused to imply exceptions to § 1341 based on the mere existence of a general federal right of action or a general jurisdictional statute that does not specifically pertain to state taxation. *See, e.g., Fair Assessment*

*in Real Estate Ass'n v. McNary*, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (declining to treat the broad language of § 1983 as an exception to § 1341); *Ashton v. Cory*, 780 F.2d 816, 821 (9th Cir.1986) (refusing to read ERISA as an exception to § 1341 because "[n]othing in the legislative history of ERISA suggests that in enacting federal law to protect individual pension rights and providing for exclusive federal jurisdiction over certain civil enforcement proceedings under ERISA, Congress sought to override the historic concern for state fiscal autonomy that underlies the Tax Injunction Act"). Where congressional interference with state fiscal autonomy is so clear and unequivocal, particular concern about federal *judicial* interference with state revenue collection is less justified.

Additionally, whereas state revenue collection would be seriously interrupted if any taxpayer with a plausible § 1983 claim or any pensioner with a tax grievance could sue in federal court, § 581(c)(5)'s protection, by contrast, is sharply delimited to commuter authorities that could have contracted with Amtrak for operation of local rail service. Defendants have failed to provide any reason to conclude that Congress believed that for SEPTA to enforce its tax immunity in federal court would be more disruptive of state tax systems and applicable principles of comity than for Amtrak to do the same. Similarly, this is not an instance where the validity of state tax assessment turns on questions of state tax

---

**20.** Where an exercise of jurisdiction is constitutionally allowable, the objective of this rule is nothing more than to ensure that courts of limited jurisdiction exercise no more power than Congress intended. Scrupulous attention to statutory jurisdictional language is designed to effectuate—not deny—congressional intent. Therefore, most instances in which jurisdictional grants have been narrowly construed have involved the diversity statute, 28 U.S.C. § 1332, where strict construction is required because *Congress* itself followed a policy of narrowing federal court jurisdiction. *See Healy*, 292 U.S. at 270, 54 S.Ct. at 703 (noting that the "policy of the [diversity] statute calls for its strict construction"); *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76, 62 S.Ct. 15, 20, 86 L.Ed. 47

(1941). Conversely, where congressional intent has not pointed toward a narrowing construction, courts have not hesitated to construe jurisdictional grants broadly. *See McCarthy v. Bronson*, —— U.S. ——, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (although 28 U.S.C. § 636(b)(1)(B) confers jurisdiction on magistrate judges only to hear "prisoner petitioners challenging conditions of confinement," magistrate judges may hear § 1983 cases in which prisoner seeks relief as to particular incidents of his treatment rather than the overall conditions of his confinement); *Investment Co. Inst. v. Bd. of Governors of the Fed. Reserve Sys.*, 551 F.2d 1270, 1276–81 (D.C.Cir.1977) (interpreting the word "order" more broadly in jurisdictional section than in other sections of the Bank Holding Act of 1956).

law, " 'which, like issues of state regulatory law, are more properly heard in the state courts.' " *California v. Grace Brethren Church,* 457 U.S. 393, 410, 102 S.Ct. 2498, 2509, 73 L.Ed.2d 93 (1982) (citation omitted). Rather, Congress has created an exemption whose contours turn exclusively on interpretation of congressional purpose.

For all of these reasons, I conclude that § 581(c)(5), read—as it must be—in conjunction with § 546b, was enacted as an exception to the Tax Injunction Act.

## V

### Eleventh Amendment

Even though the Commonwealth is not actually named as a defendant in this litigation, the PUC argues that the Eleventh Amendment bars any action against the

PUC unless it has consented to that suit. The PUC contends that it deserves Eleventh Amendment immunity because, under state law, it is "an arm of the Commonwealth of Pennsylvania" with powers to regulate railroads that are clearly derived from the legislature of the Commonwealth. PUC's Mem. in Sup. of Mot. at 8 (filed in Civ. A. No. 92–3793).

■■■■ It is true that normally a suit may not brought in federal court against a state or one of its departments or agencies, regardless of the nature of the relief sought. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). However, even assuming, *arguendo,* that the PUC is otherwise entitled to Eleventh Amendment immunity as an "arm-of-the-state," [21] Congress may abrogate that immunity by mak-

---

**21.** The PUC appears to rest its claim to immunity on the fact that the state legislature has delegated certain functions to the PUC. However, the mere performance of certain functions delegated by the state does not suffice to turn the action into one against the state. Were the PUC entitled to such blanket immunity, the twenty previous occasions in which the district courts of this circuit have entertained claims against it would appear strange indeed. (This figure comes from a Westlaw search of instances in which the PUC has been named as a defendant in a federal court action within the Third Circuit.)

Generally speaking, a state organization will not be regarded as the *alter ego of the state* unless payment of a judgment will have to be made out of the state treasury. *See, e.g., Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807, 818 (3d Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992) (noting that the most important question in deciding whether a state organization is an alter ego of the state is "whether any judgment would have to be paid from the state treasury"); *Fitchik v. New Jersey Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989) (same); *Urbano v. Bd. of Managers,* 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970) (same); *cf. Blake v. Kline,* 612 F.2d 718, 721 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980) (emphasis added) ("The eleventh amendment has been interpreted to bar jurisdictionally the federal courts from entertaining suits *for damages* when a state is the real party in interest."). By focusing on the source of any expected damage award, the "arm-of-the-state"

doctrine coincides with the well-settled understanding that the Eleventh Amendment "bars suits in federal court 'by private parties seeking to impose a liability which must be paid from public funds in the state treasury' " *Hafer v. Melo,* —— U.S. ——, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991), quoting *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974), and does not bar non-money suits against state officers to enjoin violations of federal law. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

This is not a case where equitable relief has the effect of awarding retrospective money damages against the state treasury, *see Edelman, supra,* since SEPTA in no sense seeks the recovery of funds from the state treasury but rather hopes to preclude the PUC from assessing fees against it. Even if the requested injunction would cost the state a great deal of money in the future, it would not be barred by the Eleventh Amendment, *see, e.g., Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Edelman, supra;* however, in this case the Commonwealth would appear to suffer no financial loss as the result of an injunction against the allocation of maintenance costs to SEPTA for the bridges in question. The PUC allocates costs of bridge maintenance among interested parties; therefore, if SEPTA were exempt, a greater percentage of those costs would presumably be shifted to other interested parties—like the townships joined in these cases—which are not entitled to Eleventh Amendment immunity. *See, e.g., Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Therefore, it appears doubtful that the

ing its intention to do so "unmistakably clear in the language of the statute." [22] *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). Having already found that Congress plainly intended for SEPTA to have a right to enforce its tax immunity in federal court,[23] and since SEPTA is, like Amtrak, "exempt from any taxes or other fees *imposed by any State, political subdivision of a State,* or local taxing authority ...," § 546b (emphasis added), it follows that Congress clearly evinced an intent to subject states to suit in federal court when they impose "taxes or other fees" in violation of §§ 546b and 581(c)(5).[24] Therefore, the Eleventh Amendment does not prevent this court from entertaining jurisdiction over SEPTA's consolidated actions against the PUC.

### VI

### Conclusion

Because SEPTA states a colorable claim that § 581(c)(5) precludes the allocation of bridge maintenance costs to SEPTA, and neither § 1341 nor the Eleventh Amendment prevents this court from exercising jurisdiction over the instant cases, defendants' motions to dismiss for lack of subject matter jurisdiction and failure to state a claim will be denied.

---

PUC should be treated as an "arm-of-the-state" in these cases.

**22.** Contrary to the PUC's assertions that Congress may abrogate Eleventh Amendment immunity only for the limited purpose of enforcing rights under the Fourteenth Amendment, the Commerce Clause grants Congress power to enact a statute that abrogates the Eleventh Amendment, *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 13–23, 57, 109 S.Ct. 2273, 2281–86, 2295, 105 L.Ed.2d 1 (1989), and it is undeniable that state burdens on interstate railroad service fall within the scope of the Commerce Clause.

**23.** *See supra* Part IV.

**24.** *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), demon-

strates that a statute may abrogate the Eleventh Amendment even when, as here, congressional desire to subject the States to suit in federal court only comes into focus when that statute is read in conjunction with another closely related statute. *See* 491 U.S. at 8–9 n. 2, 109 S.Ct. at 2278 n. 2. *Union Gas* also shows that the absence of explicit reference to the Eleventh Amendment in §§ 546b and 581(c)(5) does not preclude a finding of congressional abrogation. Even those Justices in *Union Gas* who determined that the statute in question was not sufficiently clear to abrogate the Eleventh Amendment emphasized that they "would not go so far as to hold that Congress must ... make reference to the Eleventh Amendment ... before it will be deemed to have abrogated States' immunity...." 491 U.S. at 56 n. 7, 109 S.Ct. at 2294–95 n. 7.