**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 7, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 7, 2024

*Erin L. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ASSURANCE WIRELESS USA, LP, f/k/a VIRGIN MOBILE USA, LP, | NO. 101873-8 |
| Petitioner, | EN BANC |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | Filed: March 7, 2024 |
| Respondent. | |

STEPHENS, J.—This case concerns the federal "Lifeline" program, which subsidizes wireless services for low-income consumers. We must decide whether the funds received by participating telecommunications carriers are subject to Washington's retail sales tax.

Assurance Wireless USA LP is a telecommunications company and provider of Lifeline services in Washington State. It provides free mobile devices and wireless services to Lifeline-eligible consumers and receives a $9.25 reimbursement for each Lifeline consumer served. The Department of Revenue (Department) audited Assurance and assessed retail sales tax, business and occupation (B&O) tax, and interest on the reimbursements Assurance received between 2010 and 2016.

Assurance challenged the assessments before the Board of Tax Appeals (BTA), arguing that the transactions were not retail sales and thus should not be taxed at the retail sales tax rate, and that even if they were, the Department was effectively taxing the federal government in violation of the intergovernmental tax immunity doctrine.

The BTA upheld the retail tax assessments, finding that the transactions constituted retail sales, that the "buyer" from whom Assurance should have been collecting the tax was the Universal Service Administrative Company (USAC)—the nonprofit the Federal Communications Commission (FCC) appointed to administer Lifeline—and that because any tax burden on the federal government was indirect, the assessments were constitutional. The BTA also rejected Assurance's argument that USAC should itself be considered a tax-immune instrumentality of the federal government. Assurance sought judicial review, and the Court of Appeals, Division One, affirmed.

We granted discretionary review and now reverse. While we agree that the transactions at issue in this case were retail sales and that the legal incidence of this tax falls on USAC, the buyer, we conclude that USAC operates as an instrumentality of the federal government, the retail sales tax therefore violates the intergovernmental tax immunity doctrine as applied in this case. We reverse the Court of Appeals and remand to the BTA for further proceedings consistent with this opinion.

BACKGROUND AND PROCEDURAL HISTORY

*History of the Lifeline Program and the Creation of USAC*

The Communications Act of 1934 gives the FCC responsibility for "mak[ing] available, so far as possible . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Recognizing the crucial role that telephone service plays in modern society, the FCC created the Lifeline program in 1985 to provide telephone services to vulnerable populations at a subsidized rate. *See* MTS and WATS Market Structure; and Establishment of a Joint Board; Amendment, 50 Fed. Reg. 939, 941 (Jan. 8, 1985). Congress later codified this program as part of the Telecommunications Act of 1996, 47 U.S.C. § 254. *See, e.g.*, *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 444 U.S. App. D.C. 24, 940 F.3d 1, 68 (2019) (per curiam) (discussing the history of the Lifeline program, citing 47 U.S.C. §§ 214, 254).

The FCC oversees four universal service programs, including Lifeline, but it does not administer them directly. In May 1997, the FCC appointed the National Exchange Carrier Association (NECA) as temporary administrator of the universal service support mechanisms. Federal-State Joint Board on Universal Service, CC Docket No. 96-45, FCC 97-157, 12 FCC Rcd. 8776, 8798 (May 8, 1997). In response to concerns about NECA's ability to fairly represent all market interests, the FCC made its appointment contingent on NECA forming an independent not-

3

for-profit entity to administer the programs on its behalf. Changes to the Board of Directors of National Exchange Carrier Association, CC Docket No. 97-21, FCC 97-253, 12 FCC Rcd. 18400, 18401-02 (July 18, 1997) (Changes to Board I), https://docs.fcc.gov/public/attachments/FCC-97-253A1.pdf [https://perma.cc/F4E9-U2AE]. This entity, USAC, was initially responsible for administering two of the universal service programs: Lifeline and the high-cost area support mechanism. *Id.* at 18415. In 1998, the FCC directed the consolidation of administrative responsibilities for all universal service programs under USAC and named it permanent administrator. Changes to the Board of Directors of the National Exchange Carrier Association 13 FCC Rcd. 25058, 25059-60 (Nov. 20, 1998) (Changes to Board II); https://digital.library.unt.edu/ark:/67531/metadc2340/m1/166/ [https://perma.cc/SBS3-RLVS]; *see also* 47 C.F.R. § 54.701(a).

The Universal Service Fund (USF) receives mandatory contributions from interstate telecommunications service providers. 47 C.F.R. § 54.706. The contribution amount is based on the contributors' projected revenues and a contribution factor set by the FCC on a quarterly basis. 47 C.F.R. § 54.709. To receive the basic support amount—currently set at $9.25 per eligible consumer—a Lifeline carrier must submit FCC form 497 (the "Lifeline Worksheet") to USAC and certify that it will pass through the full amount of support to the consumer, either as

4

a reduction in the consumer's bill or by offering a prepaid plan. 47 C.F.R. § 54.403(a)(1); *see also* Lifeline Worksheet (Apr. 2012 ed.) (carriers seeking reimbursement are required to certify that their company "will pass through the full amount of all Non-Tribal and Tribal federal Lifeline support for which it seeks reimbursement, . . . to all qualifying low-income subscribers by an equivalent reduction in the subscriber's monthly bill for voice telephony service, or by offering a pre-paid wireless plan that includes a set number of minutes of use per month") https://www.usac.org/wp-content/uploads/lifeline/documents/forms/FCC-Form-497-EDITABLE-2012.pdf [https://perma.cc/CPF2-Z7AX]. USAC provides this support directly to the carrier based on the number of qualifying low-income customers the carrier is serving as of the first of each month. 47 C.F.R. § 54.407(a). Where the carrier opts to provide a prepaid plan, it may receive USF funds only after the subscriber has activated their service and only for so long as the subscriber makes qualifying use of the service within each subsequent 30-day period. *See* 47 C.F.R. § 54.407(c)(2).

*Procedural History*

Assurance is a telecommunications carrier and a provider of Lifeline services in Washington State. Assurance opted to provide its Lifeline services in the form of free prepaid plans. These plans include a free wireless phone and a fixed amount of voice minutes, text messages, and data. If consumers exceed their free allocation of

services, they may purchase additional services at a fixed rate. The reimbursement rate for the prepaid plans was $9.79 per subscriber prior to September 2012, and $9.25 per subscriber from September 2012 to December 2016.

The Department audited Assurance's excise records for the period of January 2010 to December 2011 and assessed $768,493 in taxes, including B&O tax, retail sales tax, and interest. Assurance appealed the assessment, and while the appeal was pending, the Department conducted an audit for the period of January 2012 to December 2016, assessing an additional $3,986,316 in combined B&O tax, retail sales tax, and interest. Assurance petitioned for review of the second assessment, which was consolidated with the earlier appeal. The Department upheld the assessments, and Assurance appealed to the BTA, seeking a refund of $3,895,840.

The Department moved for summary judgment dismissing Assurance's challenge, which the BTA granted. The BTA concluded that the Lifeline disbursements were subject to the retail sales tax, that USAC was the buyer for tax purposes, and that USAC was not a tax-immune instrumentality of the federal government. Assurance sought judicial review in King County Superior Court, and the appeal was transferred to the Court of Appeals, Division One. In a published decision, the Court of Appeals affirmed that the Lifeline transactions qualified as retail sales and that USAC was not a tax-immune instrumentality. *Assur. Wireless USA, LP v. Dep't of Revenue*, 25 Wn. App. 2d 237, 522 P.3d 65 (2022). However,

6

the Court of Appeals declined to specify whether the buyer was USAC or the Lifeline consumers. *Id.* at 253.

ANALYSIS

To resolve this case, we must first determine whether a retail sale occurred at all, and if so, whether there is a qualifying buyer from whom Assurance could lawfully collect the retail sales tax. Our inquiry does not end there, however, as we must decide whether collection of the tax is prohibited by federal statute or the intergovernmental immunity doctrine. These are all questions of law, and our review is therefore de novo. *Steven Klein, Inc. v. Dep't of Revenue*, 183 Wn.2d 889, 895, 357 P.3d 59 (2015). As this opinion will explain, we find the Lifeline transactions were retail sales because Assurance received valuable consideration for the services it rendered. We further agree with the BTA that USAC—not the FCC—is the buyer legally obligated to pay Assurance for these services and therefore bears the legal incidence of the retail sales tax. However, after considering the special relationship between USAC and the FCC, we hold it is an instrumentality of the federal government and therefore immune from state taxation.

1. <u>Assurance's provision of prepaid wireless services in exchange for Lifeline support funds constitutes a retail sale</u>

Assurance argues that its participation in the Lifeline program is not a retail sale because it receives no valuable consideration for the services it provides. At

7

summary judgment, the BTA ruled that there was a retail sale, based on the exchange of telecommunications services as consideration for the Lifeline support funds. The Court of Appeals affirmed the BTA on this issue. *Assur. Wireless*, 25 Wn. App. 2d at 247. We agree.

A person making retail sales in Washington is subject to two taxes: (1) a retailing B&O tax, calculated as a percentage of gross proceeds of sales, and (2) a sales tax, calculated as a percentage of the selling price of each sale. RCW 82.04.220 (B&O tax); RCW 82.08.020 (sales tax). A "sale" is the "transfer of the ownership of, title to, or possession of property for a valuable consideration and includes any activity classified as a 'sale at retail' or 'retail sale' under RCW 82.04.050." RCW 82.04.040(1). This includes sales of "'telecommunications service[s].'" RCW 82.04.050(5). "Valuable consideration" includes the exchange of "money, credits, rights, or other property expressed in terms of money," whether actually received or accruing as a debt or claim upon the transfer of the property. RCW 82.04.090 ("'Value proceeding or accruing' means the consideration, whether money, credits, rights, or other property expressed in terms of money, actually received *or accrued*." (emphasis added)).

Assurance's argument is that its participation in the Lifeline program involves two separate business activities, neither of which constitutes a retail sale. First, Assurance gives away free prepaid phones and wireless services. At the time of this

8

transaction, Assurance says it receives no valuable consideration and thus no sale has occurred. Later, Assurance receives disbursements for participating in the Lifeline program after submitting the Lifeline Worksheet to USAC. Although the amount it receives is based on the number of active Lifeline subscribers, Assurance contends that the disbursements are not actually consideration for the telecommunications services rendered. Instead, it says the money is for participating in the Lifeline program and following FCC regulations. Assurance stresses language in the Code of Federal Regulations that call the disbursements a "[r]eimbursement for *offering* Lifeline" and that the amount of reimbursement is to be "*based* on the number of actual qualifying low-income customers." 47 C.F.R. § 54.407(a) (emphasis added).

The BTA concluded there is a taxable retail sale involving three parties—the consumer/Lifeline recipients, USAC, and Assurance—and that "[t]he consideration [Assurance] receives from USAC for providing the Lifeline service is the consideration for the telecommunication service that is subject to Washington's tax." Clerk's Papers (CP) at 59. The Court of Appeals affirmed, holding that

> [i]nstead of there being two unrelated activities, the amount of Lifeline funding Assurance receives is directly tied to the number of Lifeline plans it provides. That Assurance may voluntarily reduce this number and that there is some time period between the time when Assurance provides Lifeline service and the time it receives funds from USAC do not, separately or together, attenuate the connection between these two 'activities' such that there is no retail sale as defined by Washington tax law.

9

*Assur. Wireless*, 25 Wn. App. 2d at 245.

Assurance argues the Court of Appeals wrongly concluded that reimbursements are consideration merely because they "pertain to" a taxable service. Put differently, not all transfers of property are retail sales—there must be a transfer in *exchange* for consideration, and Assurance believes the Court of Appeals glossed over this important distinction. While Assurance is correct that retail sales require a transfer of property and corresponding transfer or accrual of valuable consideration, Assurance does in fact receive valuable consideration when it provides the Lifeline services. Although it does not record revenue until it has submitted a reimbursement request, after the services have been provided, Assurance accrues a legal entitlement to the Lifeline support funds. Indeed, it recognizes this claim to reimbursement using accrual accounting, logging its expected reimbursements in an account receivable until the refunds are received. Assurance accrues a legal claim to $9.25 per active subscriber as consideration for the services it provides, which is valuable consideration within the meaning of the statute.

Assurance relies on two Washington cases to support its argument that the service it provides to customers is separate from reimbursements received from USAC. The first is *Activate, Inc. v. Department of Revenue*, 150 Wn. App. 807, 209 P.3d 524 (2009). There, Activate, a retail seller of cell phones and wireless plans, purchased cell phones from AT&T suppliers and then offered them to consumers for

free, contingent on them signing up for an AT&T service plan. *Id*. at 810. For every customer who signed up for a plan, Activate would receive a commission from AT&T. *Id.* Activate did not pay sales tax on the cell phones it bought, claiming the resale exemption, but when the Department learned that Activate had been giving them away "'without an additional or separate charge,'" it assessed retail sales tax on the purchases. *Id.* at 810-11 (quoting court papers). Activate argued that it was not really giving away the phones; instead, it was reselling them in exchange for the consumers' promise to buy an AT&T plan, which would result in Activate being paid a commission. *Id.* at 818. The Court of Appeals rejected this argument, holding "a customer's promise to enter into a service agreement with a third party [does not] meet[] the statutory definition of 'valuable consideration' under RCW 82.04.040(1)." *Id.* (emphasis omitted).

Assurance's reliance on *Activate* is misplaced. Activate never had a legal expectation of receiving compensation for the phones themselves but, instead, reaped a reward for selling AT&T service plans. *Id.* That Activate used the phone-giveaways to stimulate the sale of service plans did not convert the resulting commissions into consideration for the phones. *Id.* But here, Assurance accrues a legal claim to $9.25 for each qualifying low-income consumer that it provides services to, and the payments are clearly *for* the services. 47 C.F.R. § 54.407 (reimbursement to carrier "based on the number of actual qualifying low-income

11

consumers" it serves). It is not, as Assurance maintains, an incentive for the more abstract activity of participating in Lifeline, divorced from the value of actual taxable services rendered. If the reimbursements were simply for offering Lifeline, Assurance could expect reimbursements regardless of whether it actually served any qualifying Lifeline consumers. Instead, Assurance must show that it has provided Lifeline services, and it is entitled to reimbursement only commensurate with the number of customers it has actually provided services to. *Id.* Thus, the reimbursements are best viewed as consideration for Assurance's prepaid plans.

Assurance next cites *Klein*, 183 Wn.2d 889. *Klein* is similar to *Activate* in that it concerned a commission—referred to as "dealer cash"—paid by Honda to dealerships if they sold certain models of cars within specified time frames. *Id.* at 891. We held that the receipt of dealer cash was not a retail sale because Klein Honda (the dealer) was not selling cars to Honda. *Id.* at 898. Instead, the dealer cash represented an "extra benefit" that the dealer received "in addition to the money it would ordinarily make from retail sales without the dealer cash program." *Id.* at 898-99. *Klein* is also unhelpful to Assurance. In *Klein*, the dealer cash did not apply to the sale—the money was not in exchange for the car itself, but for the act of *selling* the car. *Id.* at 901. Here, USAC is paying money to be applied to the sale of wireless services to low-income consumers, making the payments part of the sale itself.

12

In sum, the Lifeline transactions at issue here qualify as retail sales. When Assurance provides a prepaid plan to each consumer, it accrues a legal interest in the Lifeline support funds. This is the valuable consideration it receives for its services, and the fact that it realizes cash revenue only at a later date does not sever the sale into two separate transactions.

2. USAC bears the legal incidence of the retail sales tax because it is the "buyer" in the Lifeline transaction

The BTA concluded that USAC, not the FCC, was the buyer legally obligated to pay for the Lifeline services. The Court of Appeals agreed with the BTA that the FCC was *not* the buyer, but it declined to answer whether the actual buyer was USAC or the Lifeline consumers. *Assur. Wireless*, 25 Wn. App. 2d at 249. The Court of Appeals did not find it necessary to decide because, in its view, neither of these potential buyers could claim tax immunity. *Id.* at 252-53. We disagree. Applying the proper analysis under the intergovernmental tax immunity doctrine, the USAC is a tax-immune instrumentality of the federal government. We must therefore determine who the buyer is in the Lifeline transaction triangle.

The legal incidence of the retail sales tax falls on the buyer. RCW 82.08.050. The buyer is the one who has the legal obligation to pay the seller, regardless of who ultimately pays. *Canteen Serv., Inc. v. State*, 83 Wn.2d 761, 762, 522 P.2d 847 (1974) ("The legal incidence of a tax does not always fall upon the same person or

13

entity as the economic burden." (citing *Alabama v. King & Boozer*, 314 U.S. 1, 62 S. Ct. 43, 86 L. Ed. 3 (1941); *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 74 S. Ct. 403, 98 L. Ed. 546 (1954)). A leading case explaining the difference is *Murray v. State*, 62 Wn.2d 619, 384 P.2d 337 (1963), where this court recognized that mortgagor-builder corporations involved in military housing projects were the relevant buyers for sales tax purposes because they were contractually obligated to pay the contractors for constructing the housing, even though the funds came from the federal government. *Id.* at 624-25. Sellers are obligated to collect sales tax, and if the seller fails to collect the sales tax from the buyer, they will be held liable to the State for the full amount of the tax. RCW 82.08.050(3). Until paid, the amount of the tax is considered a debt from the buyer to the seller. RCW 82.08.050(8).

Lifeline consumers are not the buyers because they have no legal obligation to pay for the prepaid plans. The parties agree on this point. If consumers wish to "top-up" their accounts after exhausting their 250 monthly minute allocation, they can do so by registering a payment method or by purchasing "Top-Up cards" at retail locations. CP at 180. But these are separate transactions for which Assurance does collect and remit sales tax. Unless the consumers choose to make such additional purchases, Assurance has no legal expectation of payment from them.

Assurance maintains that if the Lifeline program involves a retail sale at all, the FCC is the true buyer. In support of this assertion, Assurance makes three claims:

14

(1) Congress delegated the Lifeline program to the FCC, (2) Lifeline's only source of funding is federal funds that may be used only for purposes designated by Congress, and (3) USAC is merely an administrator or instrumentality of the FCC. In our view, none of these asserted facts, separately or combined, can satisfy Assurance's burden of demonstrating that the tax falls on the FCC. *See Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149-50, 3 P.3d 741 (2000) (the taxpayer has the burden of proving entitlement to a refund).

Delegating a program to a federal agency does not exempt from taxation the funds paid to contractors in furtherance of that program, unless clearly indicated in statute. For example, in *Murray*, the federal Capehart Act tasked the United States Secretary of Defense with assessing the need for military housing and entering into contracts for its construction. *See Murray*, 62 Wn.2d at 620-21. Congress expressly delegated this program to the United States Department of Defense, but this did not immunize the funds it paid to construction companies from taxation. *Id.* at 625. Critically, the government chose to interpose a third party between itself and the recipients of the funds. *See id.* at 626. The contractors established these "mortgagor-builder" corporations for the sole purpose of facilitating their building contracts with the federal government, and the federal government supplied them with funds. *Id.* at 626-27. Nonetheless, this court held that because the contract named the mortgagor-builders as the parties obligated to pay the contractors, the mortgagor-

builders bore the legal incidence of the tax. *Id.* at 629-30; *see also F.D. Rich Co. v. Dep't of Revenue*, 79 Wn.2d 296, 484 P.2d 1138 (1971) (reaching the same conclusion on almost identical facts). Like in *Murray* and *F.D. Rich Co.*, USAC stands between the FCC and Assurance such that the legal incidence of the sale tax cannot be said to fall directly on the FCC.

Other cases reinforce the reasoning in *Murray*. In *King & Boozer*, the Court held that a tax on a federal contractor did not amount to a tax on the federal government, even where the contract terms required the government to reimburse the contractor for sales taxes paid on construction materials. 314 U.S. at 14; *cf. Kern-Limerick, Inc.*, 347 U.S. at 126 (Douglas, J., dissenting) (Navy purchasing agents exempt from state sales tax because purchasing orders identified the government as the actual purchaser and the entity solely liable for the purchase price). The Court has upheld taxes imposed on cost-plus-fixed-fee contractors in several other cases, including where the funds were drawn directly from federal funds, as opposed to being reimbursed to the contractors. *See United States v. Boyd*, 378 U.S. 39, 84 S. Ct. 1518, 12 L. Ed. 2d 713 (1964); *United States v. New Mexico*, 455 U.S. 720, 102 S. Ct. 1373, 71 L. Ed. 2d 580 (1982); *United States v. California*, 507 U.S. 746, 113 S. Ct. 1784, 123 L. Ed. 2d 528 (1993). These cases involve transactions similar to the Lifeline program, in that the economic burden falls on a federal program or agency, but not the legal incidence.

16

Assurance also claims that the Lifeline disbursements are federal funds over which USAC exerts a purely ministerial role. In Assurance's view, because USAC is a mere conduit for the funds, the Department is taxing the federal funds directly, and therefore taxing the federal government. This argument has some appeal, but there are two problems with it. First, it is not clear that the USF contributions can be considered "federal funds" in the sense Assurance implies.[1] We think this point is debatable. But even if the Lifeline disbursements are classified as federal funds, this would not be dispositive as to whether the federal government bears the legal

---

[1] *See, e.g.*, *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006) ("The USF contributions are not defined as federal funds; however, they exist because of a federal mandate." (citing *In re LAN Tamers, Inc.*, 329 F.3d 204, 206 (1st Cir. 2003))). Telecommunication carriers directly pay funds into the USF, and USAC distributes the funds to the Lifeline carriers. The FCC does not control the money except indirectly through regulation of USAC. *Id.* at 1071 ("While we recognize that the FCC does hold substantial power over the fund indirectly, essentially by overseeing USAC, we also recognize that it has no ability to control the USF through direct seizure or discretionary spending.") This arrangement has created confusion over how to classify the funds. *Compare United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379 (5th Cir. 2014) (holding that although the FCC maintains a regulatory interest in the USF funds, it does not "provide" any of the funds, and thus disbursements were not subject to the False Claims Act), *with United States ex rel. Heath v. Wis. Bell, Inc.*, 111 F. Supp. 3d 923 (E.D. Wis. 2015) (concluding that the government "provided" the money despite being held in a private fund and administered by a private company). *See also* Memorandum of Understanding between the Fed. Commc'ns Comm'n & the Universal Serv. Admin. Co. at 1 (Dec. 19, 2018) ("The monies of the USF are federal funds."), https://www.fcc.gov/sites/default/files/usac-mou.pdf [https://perma.cc/3QNE-YECV]; ("The monies of the USF are federal funds"); ANGELE A. GILROY, CONG. RSCH. SERV., UNIVERSAL SERVICE FUND: BACKGROUND AND OPTIONS FOR REFORM 4 (June 30, 2011) ("The USF receives no federal monies . . . ."), https://sgp.fas.org/crs/misc/RL33979.pdf [https://perma.cc/Q2EB-SXF9].

17

incidence of the tax, only proof that it shoulders the economic burden. *Murray*, 62 Wn.2d at 620-21. Constitutional immunity applies solely in circumstances where the tax falls *directly* on the federal government or its instrumentality. *See California*, 507 U.S. at 753; *New Mexico*, 455 U.S. at 735 ("immunity cannot be conferred simply because the tax is paid with Government funds"). In *California*, the Court upheld taxes imposed on federal contractors, even where the taxes were paid directly out of a bank account controlled by the federal government. 507 U.S. at 753 ("[T]he Government's voluntary agreement to reimburse (or even fund in advance) [its contractor] for [state] taxes does not make the Government's payments direct disbursements of federal funds to the State.").

We conclude the BTA correctly identified USAC as the buyer in this retail sale transaction. USAC is the party responsible for paying Lifeline carriers for their services. Carriers must submit their Lifeline Worksheets to USAC, not the FCC, and USAC is obligated to disburse the funds. Assurance received its reimbursements directly from USAC. The fact that the FCC exerts substantial control over USAC is insufficient under the Supreme Court's precedent to show that the tax falls directly on the federal government. That does not end our inquiry, however, as we must further examine whether USAC is itself an entity immune from taxation.

3. <u>USAC is a tax-immune instrumentality of the federal government and therefore the retail sales tax is unconstitutional as applied</u>

There are two situations in which the imposition of a state tax might be prohibited by federal law: first, where Congress has expressly extended immunity by statute (statutory preemption), and second, where the tax falls directly on the federal government or its instrumentalities thereby offending the intergovernmental immunity doctrine (constitutional preemption). The Supreme Court recognized constitutional preemption in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819), explaining that although the Constitution lacks any express prohibition, allowing states to tax the instruments through which the federal government exercises its powers and duties would be fundamentally inconsistent with our constitutional structure. As a result, instrumentalities of the federal government are immune from all forms of taxation absent an express Congressional waiver of immunity. *See Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 665 F. Supp 402, 409 (E.D. Pa. 1987) (collecting cases), *aff'd*, 848 F.2d 436 (3d Cir. 1988). Still, courts construe the universe of tax-immune instrumentalities narrowly. *See New Mexico*, 455 U.S. at 735, 737.

If the entity being taxed is not a federal instrumentality, nondiscriminatory taxes are valid absent an express statutory grant of tax immunity. Congress sometimes expressly designates an entity as tax immune. *See First Agric. Nat'l Bank*

*of Berkshire County v. State Tax Comm'n*, 392 U.S. 339, 88 S. Ct. 2173, 20 L. Ed. 2d 1138 (1968). In *First Agricultural National Bank*, the Court held a state tax on shares of a national bank to be unconstitutional because a federal statute expressly preempted the tax. And because this was an independently sufficient basis to reverse, the Court declined to reach the State's broader attack on *M'Culloch*'s relevance to modern national banks and whether they should be viewed as categorically tax immune. Congress can also immunize "contracts in a particular form, or contracts under particular programs," which would provide a more limited form of immunity embracing only those activities of contractors that pertain to the government programs. *New Mexico*, 455 U.S. at 737 (citing *James v. Dravo Contracting Co.*, 302 U.S. 134, 161, 58 S. Ct. 208, 82 L. Ed. 155 (1937); *Carson v. Roane-Anderson Co.*, 342 U.S. 232, 234, 72 S. Ct. 257, 96 L. Ed. 257 (1952)). In either case, tax-immune status would be purely a matter of statute.

## A. Taxation of Universal Service Funds Is Not Preempted by Any Statute

Assurance and amici point to two statutory provisos they claim exempt USF funds from state taxation. Assurance cites 47 U.S.C. § 254(e) to support its claim that using USF funding to pay state taxes is prohibited by federal law. The statute says, in relevant part, "A carrier that receives such support shall use that support *only* for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e) (emphasis added). But the relevant

20

statutes say nothing about taxes, nor does the cited language indicate an intent to immunize the funds from taxes levied on otherwise eligible expenditures of USF funds. This falls well short of the clear legislative expression required to establish statutory tax immunity, and we do not read this language narrowing the permissible uses of funding as implicitly exempting eligible expenditures from otherwise lawful taxes.

Amici raise a statutory preemption argument based on a different proviso— 47 U.S.C. § 254(f). This portion of the statute allows states to adopt regulations to advance universal service within their states, provided that these regulations are not inconsistent with the FCC's rules and that they adopt "additional specific, predictable, and sufficient mechanisms to support such [programs] or standards that do not rely on or burden Federal universal service support mechanisms." 47 U.S.C. § 254(f). Amici cite to a recent case, *Virgin Mobile USA, LP v. Keen*, 447 F. Supp. 3d 1071, 1091 (D. Kan. 2020), where the court found Kansas' regulations requiring Lifeline carriers to contribute to the state's universal service program based on their Lifeline disbursements violated 47 U.S.C. § 254(f). But neither 47 U.S.C. § 254(f) nor its application in *Virgin Mobile USA* support amici's overly broad reading of its preemptive effect.

We agree with the BTA that 47 U.S.C. § 254(f) is inapplicable to these facts. In its decision, the BTA held that "Congress's prohibition on state-enacted service

standards that conflict with federal standards does not apply to generally applicable state taxes." CP at 60. The preemptive effect of 47 U.S.C. § 254(f) is directed at regulations the State might enact to establish or bolster their own universal service programs, not to preempt any state regulation that might have the effect of burdening the federal USF.

We conclude that Assurance is not statutorily exempt from retail sales tax and therefore turn to the dispositive question of whether it is exempt based on constitutional principles.

B. *Taxation of USAC Is Preempted by the Supremacy Clause of the United States Constitution Because USAC Is an Instrumentality of the Federal Government*

With no statutory exemption on point, the validity of the Department's tax assessment hinges on whether USAC is an instrumentality of the federal government subject to intergovernmental tax immunity. Although it is a close question, we reverse the Court of Appeals and the BTA and hold that USAC is a tax-immune instrumentality.

As noted, the supremacy clause bars states from taxing the federal government or the instruments employed by the federal government in the execution of its powers. *See M'Culloch*, 17 U.S. 316. In the century following the *M'Culloch* decision, the Supreme Court charted an expansive intergovernmental immunity doctrine that shielded federal employees' income, income derived from the lease of

22

federal land, and sales to the United States from any manner of state taxation.  *See New Mexico*, 455 U.S. at 731 (collecting cases).  Then, in *Dravo Contracting Co.*, the Court upheld a tax on a contractor's revenues earned through contracts with the federal government, noting:

> "[I]t is not necessary to cripple [the state's taxing power] by extending the constitutional exemption of taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality, and there is only a remote . . . influence upon the exercise of the functions of government."

302 U.S. at 150 (quoting *Willcuts v. Bunn*, 282 U.S. 216, 225, 51 S. Ct. 125, 75 L. Ed. 304 (1931)).  Today, the supremacy clause prohibits only those taxes laid directly on the federal government or on an entity "so closely connected to the Government that the two cannot realistically be viewed as separate entities." *New Mexico*, 455 U.S. at 735.

There is "no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality." *Dep't of Emp't v. United States*, 385 U.S. 355, 358-59, 87 S. Ct. 464, 17 L. Ed. 2d 414 (1966).  Factors courts have considered include whether the entity is organized for profit and whether the government exercises such control that the entity could be considered a "servant"; whether it was organized to effectuate a specific governmental program; whether its ownership, substantially or totally, lies with the

23

federal government; whether government officials handle and control its operations; whether its officers or any significant portion of them are appointed by the government; whether the government gives significant financial aid; and whether it is regarded "'virtually as an arm of the [g]overnment.'" *First Agric. Nat'l Bank*, 392 U.S. at 353-54 (Marshall, J., dissenting) (quoting *Dep't of Emp't*, 385 U.S. at 359-60).

The Department urges that USAC is more akin to a private contractor than to a governmental instrumentality and that *New Mexico*, 455 U.S. 720, supplies the rule of decision in cases such as this. In *New Mexico*, contractors for the United States Department of Energy (DOE) challenged state taxes levied on the funds received from the federal government as recompense for managing atomic research facilities in New Mexico. In upholding the tax assessment, the Supreme Court acknowledged the confusing nature of its precedents, particularly as to the proper role of traditional agency notions in its analysis, and clarified that to establish constitutional tax immunity, it is not enough to show a mere agency relationship between the taxpayer and the federal government. *New Mexico*, 455 U.S. at 733. Rather, there must be sufficient government control over the agent and such a congruence of professional interests that the contractor could be considered a servant or employee of the federal government. *See id.* Based on the facts before it, the Court held that private corporations managing DOE facilities under cost-plus-fixed-fee contracts were not

tax immune because government officials did not oversee their day-to-day work, the government had no ownership interest in them, they had an independent profit motive, and their relationship with the government was created for limited and carefully defined purposes. *New Mexico*, 455 U.S. at 740-41.

*New Mexico* and similar cases highlight the special importance of establishing a congruence of professional interest between an entity claiming tax immunity and the federal government. *See Boyd*, 378 U.S. at 45 (finding contractors liable for state taxes in circumstances almost identical to those in *New Mexico* and noting, "'The vital thing' is that [the contractors] '[are] using the property in connection with [their] own commercial activities'" (quoting *United States v. Township of Muskegon*, 355 U.S. 484, 486, 78 S. Ct. 483, 2 L. Ed. 2d 436 (1958)); *Muskegon*, 355 U.S. at 486 (upholding a property use assessment against Continental Motors with the caveat that the result might have been different had the government "reserved such control over the activities *and financial gain* of Continental that it could properly be called a 'servant' of the United States" (emphasis added)); *Clallam County v. United States*, 263 U.S. 341, 345, 44 S. Ct. 121, 68 L. Ed. 328 (1923) (holding that a corporation created by the government solely for the purposes of cutting spruce trees to be used in its war effort was a tax-immune instrumentality and noting, "This is not like the case of a corporation having its own purposes as well as those of the United States and interested in profit on its own account"); *see also Dep't of Emp't,*

25

385 U.S. at 360 (the fact that government officials did not oversee the day-to-day work of the Red Cross was not fatal to finding it was an instrumentality of the federal government).

Assurance cautions that *New Mexico* and *Boyd* are inapposite here because USAC is not a contractor. As Assurance notes, "[T]he FCC does not reimburse or pay USAC for anything. USAC has no customers and its activities are limited to duties delegated to it by the FCC." Assur. Wireless USA, L.P.'s Supp'l. Br. at 3. These claims are substantiated by the FCC's regulations and further supported by USAC's own public representations. *See* 47 C.F.R. § 54.702 (defining USAC's functions and responsibilities); UNIVERSAL SERV. ADMIN. CO., FEDERAL UNIVERSAL SERVICE PROGRAMS FUND SIZE PROJECTIONS & CONTRIBUTION BASE FOR THE FOURTH QUARTER *1998* (July 31, 1998) (an early report to the FCC in which the USAC represents itself as having been "created under Subpart H of the Commission's Part 54 rules for interim administration of [the USF programs] . . . ."), https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/1998/fourth-quarter/financials/FCC-Filing-Fourth-Quarter-1998.pdf [https://perma.cc/6NVW-U2N4]; UNIVERSAL SERV. ADMIN. CO., 2022 ANNUAL REPORT (2022) (USAC's annual reports are entirely concerned with its administration of the universal service programs), https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2022/

USAC_2022_Annual_Report.pdf [https://perma.cc/D2JX-W6EE]. USAC has no corporate purpose other than as defined by FCC regulations, nor does it have any independent profit motive. *See id.* Although government officials do not manage its day-to-day work, its operations are nonetheless narrowly prescribed by federal regulations. *See id.*

Given the congruity of professional interests between USAC and the FCC—found lacking in *New Mexico* and other cases involving mere contractors—we agree with Assurance that *New Mexico* is distinguishable. USAC was created for the express purpose of effecting the government's telecommunications policy objectives and the FCC played a significant role in its creation.[2] There was no bidding by

---

[2] USAC was incorporated by NECA, an organization created pursuant to an FCC mandate though otherwise independent of the agency. *See* Changes to Board of Directors of National Exchange Carrier Association, CC Docket 97-21, FCC 97-11, 12 FCC Rcd. 72, 73 (Jan. 10, 1997). https://digital.library.unt.edu/ark:/67531/metadc2339/m1/83/ [https://perma.cc/7SNE-6VVV]. The FCC issued an order directing NECA to establish the USAC and two additional, unaffiliated nonprofits—the Schools and Libraries Corporation (SLC) and the Rural Health Care Corporation (RHCC)—as a precondition to naming NECA the temporary administrator of the USF. *See* Changes to Board I, 12 FCC Rcd. 18400. The SLC and the RHCC were subsequently folded into USAC after the United States Government Accountability Office (GAO) suggested the FCC had violated the Government Corporation Control Act by ordering their creation. *See* A. Michael Froomkin, *Wrong Turn in Cyberspace: Using ICANN To Route around the APA and the Constitution*, 50 DUKE L.J. 17, 79 (2000) (The General Counsel of the GAO raised concerns that the FCC's general authority to create corporations had been abrogated by 31 U.S. § 9102. The GAO was unpersuaded by the FCC's argument that NECA, not the FCC had created the SLC and the RHCC, saying the statute "'prohibits an agency from creating *or causing creation* of a corporation to carry out government programs without explicit statutory authorization.'" (quoting Letter from Off. of Gen. Couns., Gen. Accounting Off., to the Hon. Ted Stevens, U.S. Senate at 5-6 (Feb. 10, 1998), https://www.gao.gov/assets/b-

NECA or USAC for the privilege of administering the programs; rather, the FCC directed its creation and established the regulatory framework which effectively rendered the USAC a "captive corporation" of the FCC. *See* A. Michael Froomkin, *Wrong Turn in Cyberspace: Using ICANN To Route around the APA and the Constitution*, 50 DUKE L.J. 17, 79 (2000) (describing the SLC and the RHCC—two corporations created at the FCC's direction, in a manner almost identical to USAC—as "captive" to the FCC, lacking even a pretense of independence). But our analysis does not stop here.

Assurance relies heavily on the case *Department of Employment*, where the Supreme Court held the American Red Cross to be a tax-immune instrumentality. In reaching this conclusion, the Court emphasized several characteristics of that organization and its special relationship with the federal government. First, the Court noted that the Red Cross received "substantial material assistance" from the federal government, apparently in reference to statutes granting the organization the use of its headquarters buildings in Washington, D.C. *Dep't of Emp't*, 385 U.S. at 359 & n.11. The Court also found it compelling that the American Red Cross was established by an act of Congress, and the president appoints the Red Cross'

278820.pdf [https://perma.cc/8NNL-FKFK). Although USAC was established in the same manner, the FCC defended its reliance on USAC, stating, "[W]e find it significant that the GAO made findings only with respect to the creation of SLC and RHCC; GAO did not make any findings concerning the establishment of USAC." Changes to Board II, 13 FCC Rcd. at 25066; 47 C.F.R. § 54.701(a).

principal officer and 7 of its 49 governors. *Id.* at 359. And finally, the Court pointed to a proclamation of President Taft saying the Red Cross was "the only volunteer society now authorized by this government to render aid to its land and naval forces in time of war" (citing proclamation of President Taft, August 22, 1911, 37 Stat. 1716), as well as several laws permitting the president to rely on relief organizations such as the Red Cross in coordinating disaster relief efforts. In the Court's view, this historic recognition of the Red Cross' role in supporting governmental activities counseled in favor of extending its tax immunity to the organization. *Dep't of Emp't*, 385 U.S. at 359.

We see many of these same characteristics present in the relationship between USAC and the FCC. First, USAC receives substantial material assistance from the FCC. Indeed, all of USAC's funding——whether for making disbursements or covering its own administrative expenses——come from the USF and can only be drawn with the FCC's permission. *See* 47 C.F.R. § 54.715(c) (USAC must submit quarterly budgets to the FCC for approval, and may not disburse any funds until it receives this approval); 47 C.F.R. § 54.709(c) (if the actual contributions received are insufficient to cover USAC's administrative expenses—including operational costs and disbursements—it may cover the shortfall using commercial loans secured with future contributions, but only with the express approval of the FCC). Because USAC is far more financially reliant on the federal government than even the Red

29

Cross, we find this weighs in favor of recognizing USAC as a federal instrumentality.

Further, although government officers do not participate directly in USAC's management, the FCC's involvement in determining USAC's governance structure and membership endorses its status as a federal instrumentality. The FCC appoints or approves all of USAC's board members. FCC regulations define the required composition of USAC's board and requires that board nominations be submitted to the FCC commissioner for final approval. 47 C.F.R. § 54.703. The Code of Federal Regulations likewise subjects the nomination of USAC's CEO to FCC review and defines the scope of his or her duties. 47 C.F.R. § 54.704. And if the board of USAC fails to timely submit a nomination for the position of CEO, the FCC chairperson is empowered to unilaterally appoint them. *Id.* We find this subordination of USAC's leadership appointments to FCC oversight supports recognizing USAC as a federal instrumentality.

Lastly, we note that Congress has sanctioned the FCC's reliance on USAC in administering Universal Service Programs. Our analysis is again informed by *Department of Employment*, as well as the Court's decision in *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S. Ct. 1168, 86 L. Ed. 1611 (1942). In *Standard Oil*, the Court held United States Army Post Exchanges were tax-immune instrumentalities, noting the history of congressional acts that, with varying degrees of directness,

30

acknowledged the post exchanges' work as governmental. *See Standard Oil*, 316 U.S. at 484. For instance, Congress had appropriated funds for the military to construct, equip, and maintain buildings to host the exchanges; passed laws requiring the transfer of leftover funds from disbanded exchanges to the United States Treasury; and enacted law consenting to state taxation of gasoline sold through exchanges to private buyers. *Id.* The Court concluded that the post exchanges had become "integral parts of the War Department[ that] share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the Constitution." *Id.* at 485.

Assurance points to the FCC's reliance on USAC to administer the Universal Service programs delegated to it by Congress since 1997 as proof that Congress has "acquiesced to USAC's role in administering the federal government's objective." Pet. for Rev. at 28. Standing alone, we do not find the FCC's actions particularly illuminating as to Congress' views on USAC. However, we note that Congress recently blessed the FCC's reliance on USAC in statute, saying, "The Commission shall have the authority to avail itself of the services of the Universal Service Administrative Company to implement the Affordable Connectivity Program, including developing and processing reimbursements and distributing funds to participating providers." 47 U.S.C. § 1752(i)(5). As with the U.S. Army Post Exchanges at issue in *Standard Oil*, we find it significant that USAC is instrumental

31

to helping the FCC further its mission and carry out its duties and that Congress has affirmatively sanctioned the unique relationship.

Weighing all the factors, we conclude that USAC is an instrumentality of the federal government. It exists solely to carry out the FCC's mission of advancing universal service, which includes the Lifeline program, and USAC pursues no independent business objectives. Congress has acknowledged the FCC's reliance on USAC and approved of their relationship as the means of implementing universal service programs. Further, although USAC is nominally an independent nonprofit, the FCC's regulatory control over USAC's operations, leadership composition, and finances have produced an entity so closely related to the FCC that we conclude it operates as an instrumentality of the federal government for purposes of the intergovernmental tax immunity doctrine. While some factors—such as the lack of government ownership in USAC and the absence of government officials from its internal management structure—distinguish USAC from other tax-immune instrumentalities, we do not find the distinctions dispositive. Status as a governmental instrumentality may exist notwithstanding some factors indicating a contrary conclusion. *See Dep't of Emp't*, 385 U.S. at 360 ("In those respects in which the Red Cross differs from the usual government agency—*e. g.*, in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs—the Red Cross is like other institutions—*e. g.*,

32

national banks—whose status as tax-immune instrumentalities of the United States is beyond dispute."); *see also M'Culloch*, 17 U.S. 316 (holding that the Second Bank of the United States was a federal instrumentality notwithstanding its charter dictating that 80 percent of its stock was to be privately held); *Dep't of Emp't*, 385 U.S. at 360 (affirming the tax immunity of the Red Cross, a "nongovernment-owned instrumentality").

CONCLUSION

The Lifeline transactions at issue in this case qualify as retail sales under RCW 82.04.050, and the BTA properly identified USAC as the buyer. However, neither the BTA nor the Court of Appeals properly applied the intergovernmental tax immunity doctrine. Applying the United States Supreme Court's framework for identifying federal instrumentalities, we conclude that USAC is an arm of the federal government and is therefore tax immune. And because our retail sales tax places the legal incidence on USAC, it operates to directly tax a federal instrumentality in violation of the supremacy clause.

Accordingly, we reverse the Court of Appeals and remand to the BTA for further proceedings consistent with this opinion.

_____
Stephens, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

34